**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ABBVIE INC.; ALLERGAN, INC.; DURATA THERAPEUTICS, INC.; ABBVIE PRODUCTS LLC; PHARMACYCLICS LLC; and ALLERGAN SALES, LLC, <br><br> *Plaintiffs*, <br> v. <br><br> KWAME RAOUL, in his official capacity as Illinois Attorney General, <br><br> *Defendant*. | Case No. 1:26-cv-9523 |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs AbbVie Inc., Allergan, Inc., Durata Therapeutics, Inc., AbbVie Products LLC, Pharmacyclics LLC, and Allergan Sales, LLC (collectively, "AbbVie"), by and through their undersigned attorneys, bring this action for declaratory and injunctive relief against Kwame Raoul, in his official capacity as Illinois Attorney General, challenging the constitutionality of Illinois House Bill 2371 ("H.B. 2371").  In support, AbbVie alleges as follows:

### PRELIMINARY STATEMENT

1. AbbVie brings this lawsuit to halt an unconstitutional state power grab.  Illinois enacted H.B. 2371 to compel AbbVie—an Illinois-headquartered biopharmaceutical company— to transfer its pharmaceutical products to commercial pharmacies at substantially discounted prices, on terms Congress never authorized, under pain of escalating civil penalties.  In doing so, Illinois has run headlong into the Supremacy Clause.  H.B. 2371 impermissibly rewrites the terms of a federal drug-pricing regime—the federal 340B Program—by imposing onerous State-law obligations that conflict with what Congress enacted and what the United States has said those

obligations are. H.B. 2371 also effects an unconstitutional taking in violation of the Takings Clause of the Fifth Amendment, seizing AbbVie's private property for the private benefit of commercial pharmacies without just compensation.

2. H.B. 2371 arises out of a long-running dispute about the requirements that the federal 340B Program places upon drug manufacturers. In short, the federal 340B statute, 42 U.S.C. § 256b, establishes a comprehensive program that requires pharmaceutical manufacturers to offer their drugs at statutorily set and significantly reduced prices to a list of fifteen specifically enumerated types of healthcare providers known as "covered entities." Offering these drugs to covered entities at the established significantly reduced price is required for manufacturers who want to participate in federal Medicaid and Medicare Part B. *See* 42 U.S.C. §§ 256b, 1396r-8(a)(1), (5).

3. The 340B statute's text is deliberate. Manufacturers are required only to "offer" their drugs to covered entities at the 340B price—not to "sell" them unconditionally. 42 U.S.C. § 256b(a)(1). That distinction is not a technicality; it is the heart of this case. The statute requires manufacturers to make an offer at a particular price to a particular set of covered entities—and it preserves manufacturers' liberty to insist upon other non-price terms. Equally important, commercial pharmacies like Walgreens and CVS are not covered entities. They appear nowhere in the 340B statute's list of entities entitled to receive an offer at the 340B price.

4. The federal statute grants the Secretary of the U.S. Department of Health and Human Services ("HHS") exclusive authority to enforce its provisions. *See* 42 U.S.C. § 256b(d). The statute leaves no role for States or other third parties to change the requirements of the federal 340B Program or the conditions it imposes on manufacturers in return for participation in Medicaid and Medicare. Nor do States or other third parties have any authority to enforce the federal

statute's requirements. The Supreme Court has confirmed as much, explaining that third-party enforcement "would undermine the agency's efforts to administer" the 340B Program and other related federal programs "harmoniously and on a uniform nationwide basis." *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 119-20 (2011).

5. Further, because forcing manufacturers to transfer their drugs at discounted prices to covered entities would raise serious constitutional concerns, Congress did not mandate participation in the 340B Program outright and instead tied it to an ostensibly voluntary choice: participation in Medicaid and Medicare. And to further incentivize manufacturer participation in the 340B Program—*i.e.*, to prevent the cost of participation from becoming too high—Congress carefully limited the Program and adopted certain safeguards to ensure that manufacturers' discounted drugs would be used to help needy patients rather than become a buy-low, sell-high scheme for commercial entities. For example, in a statutory provision designed to prevent "diversion," Congress prohibited covered entities from transferring manufacturers' reduced-price drugs to anyone other than the entity's own patients. *See* 42 U.S.C. § 256b(a)(5)(B). In effect, that provision prohibits other commercial entities from either participating in the 340B Program or profiting from the sale of manufacturers' drugs at the 340B-discounted price.

6. Nevertheless, over the last decade, covered entities have entered contractual arrangements with commercial pharmacies (called "contract pharmacies") that allow those pharmacies to earn windfall profits from the sale of manufacturers' discounted drugs. Instead of serving the covered entities' uninsured and low-income patients, the for-profit contract pharmacies acquire manufacturers' drugs at the federally discounted price, sell them to patients (including indigent patients) at full price, and pocket the difference. Contract pharmacies accomplish this arbitrage through a complicated accounting system known as the "replenishment model,"

described in more detail below. The bottom-line result is that for-profit commercial pharmacies and the covered entities they contract with pocket billions of dollars every year, splitting the profits at the expense of both manufacturers and the needy patients who are supposed to be served by the federal 340B Program.

7. Neither contract pharmacies nor the replenishment model are features of the ordinary commercial drug-distribution system in the United States. They solely exist in the 340B context, where they are unauthorized by statute. AbbVie is involved in no other commercial arrangement using contract pharmacies or the replenishment model. Contract pharmacies and the replenishment model are creatures only of the federal 340B drug discount arbitrage regime.

8. In response to these abuses, manufacturers (including AbbVie) have exercised their right to impose reasonable conditions on their 340B offers by implementing policies that decline to accept 340B orders for an unlimited number of contract pharmacies. For example, subject to further detail explained below, AbbVie will transfer 340B-discounted drugs to only one contract pharmacy affiliate of a covered entity, provided it is within 40 miles of said covered entity. That is in stark contrast to the arrangement that covered entities, contract pharmacies, and now, the State of Illinois, would like, in which AbbVie would be required to transfer unlimited 340B-discounted drugs to dozens or hundreds of contract pharmacies per covered entity regardless of the pharmacies' locations.

9. It is beyond dispute that AbbVie's policy complies with—and indeed, is enabled by—federal law because manufacturers are bound only to "offer" their drugs at discounted prices to covered entities. *See Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452 (D.C. Cir. 2024); *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696 (3d Cir. 2023). The 340B statute does not compel sales or unconditional offers, nor does it require manufacturers to transfer 340B-discounted drugs

wherever and to whomever a covered entity demands. And it certainly does not require manufacturers to subsidize commercial pharmacy profits under the guise of 340B compliance.

10. Unhappy with Congress's decision to permit manufacturers to condition their 340B offers, many States turned to their own legislatures to implement legislation requiring 340B-participating manufacturers to unconditionally sell their 340B-priced drugs to an unlimited number of contract pharmacies. Illinois's H.B. 2371 is an example of one such piece of legislation.

11. In particular, H.B. 2371 not only eliminates manufacturers' federally preserved ability to impose reasonable conditions on 340B offers—it imposes new conditions on Medicare and Medicaid participation that Congress never authorized. Among other things, H.B. 2371 prohibits manufacturers from limiting the "acquisition" of 340B-discounted drugs by covered entities or for-profit pharmacies contracted with covered entities. H.B. 2371, § 15(a). Illinois's law effectively gives covered entities and commercial pharmacies unfettered authority to demand manufacturers' property at significantly reduced prices for the benefit of private parties. Federal courts have recognized the blatant unconstitutionality of such laws and enjoined their enforcement. *See, e.g.*, *AbbVie Inc. v. Wrigley*, --- F. Supp. 3d ---, 2026 WL 1133457 (D.N.D. Apr. 27, 2026) (permanently enjoining enforcement on preemption grounds); *AbbVie Inc. v. Drummond*, 808 F. Supp. 3d 1266 (W.D. Okla. 2025) (preliminarily enjoining enforcement on preemption and takings grounds); *PhRMA v. Morrisey*, 760 F. Supp. 3d 439 (S.D. W. Va. 2024) (preliminarily enjoining enforcement on preemption grounds); *AbbVie Inc. v. Brown*, 809 F. Supp. 3d 1341 (D. Utah 2025) (concluding that AbbVie plausibly stated preemption and takings claims); *AbbVie Inc. v. Lopez*, No. 1:25-cv-00230, ECF 81 (D. Haw. Feb. 19, 2026) (finding that AbbVie plausibly stated preemption and takings claims).

12. This State-imposed harm—compelling manufacturers to transfer their drugs at discounted prices on terms not required by federal law and to which AbbVie would not agree—violates the United States Constitution. H.B. 2371's enforcement should be enjoined for the following reasons.

13. *First*, H.B. 2371 is preempted by federal law—namely the 340B Program—under the Supremacy Clause. A State law is preempted when it operates in an exclusively federal field or when it imposes an obstacle to achieving Congress's purposes and objectives. *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372-73 (2000). Under either standard, H.B. 2371 must yield. Illinois's law targets the federal 340B Program and changes its requirements by imposing onerous State-law obligations only on manufacturers who participate in the federal program. *See* H.B. 2371, §§ 10, 15(a). It also blocks manufacturers from requesting claims data for contract pharmacy dispenses. *See id.* § 15(c)(3). These restrictions impair liberties that the 340B statute includes and prevents AbbVie from accessing the federal 340B administrative dispute resolution system ("ADR"), in turn thwarting federal enforcement of 340B. H.B. 2371 further creates a State enforcement regime and forum that conflicts with the federal government's exclusive authority to enforce the 340B statute. *Id.* § 40.

14. *Second*, H.B. 2371 is an impermissible taking under the Fifth Amendment. It requires drug manufacturers like AbbVie to unconditionally sell 340B-priced drugs in circumstances where the federal 340B Program empowers AbbVie to decline 340B pricing. Worse, it forces AbbVie to transfer its property at steeply discounted prices to for-profit commercial pharmacies if those pharmacies have contracts with covered entities that purport to allow them to access AbbVie's drugs at those discounted prices. And H.B. 2371's text makes clear that it seeks to regulate "acquisition" of said drugs at the discounted 340B price. H.B. 2371,

6

§ 15(a). Illinois has no authority to take AbbVie's private property for private use. By expanding the circumstances under which drug manufacturers must provide 340B-priced drugs to contract pharmacies, the statute unlawfully appropriates private property for the private benefit of commercial pharmacies and does so without serving any valid public purpose. *See Horne v. Dep't of Agric.*, 576 U.S. 350, 370 (2015) (holding government's confiscation of portion of farmers' raisin crop for charitable or other purpose without just compensation was a *per se* taking). And even if the Illinois's law did constitute a public use (it does not), AbbVie is still entitled to injunctive relief as Illinois provides no just compensation and AbbVie possesses no means to compel just compensation.

15. AbbVie seeks a declaration that H.B. 2371 is unconstitutional because it is preempted by federal law and constitutes an unconstitutional taking. AbbVie further seeks the preliminary and permanent enjoining of H.B. 2371 enforcement against AbbVie.

## PARTIES TO THE ACTION

16. AbbVie Inc., a Delaware Corporation, is a global research-based biopharmaceutical company dedicated to addressing some of the world's most complex and serious diseases, advancing medical science in areas such as immunology, oncology, and neuroscience. AbbVie's headquarters are located in North Chicago, Illinois. AbbVie is one of Illinois's largest employers, with thousands of employees across the State, and is deeply committed to the Illinois communities in which it operates, including through significant charitable contributions and patient-assistance programs that provide medicines to patients regardless of ability to pay. Since 2012, AbbVie has participated in the federal 340B drug discount program, helping uninsured and vulnerable patients obtain access to the medications they need. AbbVie is a signatory to 340B Pharmaceutical Pricing

Agreements, and/or is successor-in-interest to executed 340B Pharmaceutical Pricing Agreements, with HHS's Health Resources and Services Administration ("HRSA").

17. Allergan, Inc., a Delaware Corporation, is a signatory to 340B Pharmaceutical Pricing Agreements, and/or is successor-in-interest to executed 340B Pharmaceutical Pricing Agreements, with HRSA.

18. Durata Therapeutics, Inc., a Delaware Corporation, is a signatory to 340B Pharmaceutical Pricing Agreements, and/or is successor-in-interest to executed 340B Pharmaceutical Pricing Agreements, with HRSA.

19. AbbVie Products LLC, a Georgia Limited Liability Company, is a signatory to 340B Pharmaceutical Pricing Agreements, and/or is successor-in-interest to executed 340B Pharmaceutical Pricing Agreements, with HRSA.

20. Pharmacyclics LLC, a Delaware Limited Liability Company, is a signatory to 340B Pharmaceutical Pricing Agreements, and/or is successor-in-interest to executed 340B Pharmaceutical Pricing Agreements, with HRSA.

21. Allergan Sales, LLC, a Delaware Limited Liability Company, is a signatory to 340B Pharmaceutical Pricing Agreements, and/or is successor-in-interest to executed 340B Pharmaceutical Pricing Agreements, with HRSA.

22. Defendant Kwame Raoul is the Illinois Attorney General. The Attorney General is empowered to bring legal actions enforcing H.B. 2371 against manufacturers. *See* H.B. 2371, § 40. This suit is brought against the Attorney General solely in his official capacity.

**JURISDICTION AND VENUE**

23. AbbVie's causes of action arise under 28 U.S.C. § 1331, 42 U.S.C. § 1983, and the United States Constitution.

24. The Court has subject matter jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 1332, and 28 U.S.C. § 1343(a)(3).

25. The Court has authority to grant injunctive and declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, and the Court's inherent equitable powers, including the power to enjoin the actions of State officials if contrary to the United States Constitution or federal law. *See Ex parte Young*, 209 U.S. 123, 159-60 (1908).

26. Venue is proper in this District under 28 U.S.C. § 1391(b) because this action challenges an Illinois law that is applicable to AbbVie's sale and distribution of drugs within this District. AbbVie is headquartered in this District, and it sells and distributes drugs to multiple 340B covered entities within this District. Those entities purport to maintain contract pharmacy arrangements. Venue is also proper because Defendant maintains an office within this District through which he would enforce the challenged law.

## GENERAL ALLEGATIONS

### A. The 340B Drug Pricing Program

27. This case concerns Section 340B of the federal Public Health Service Act, which created the federal "340B Program" as part of the authority granted in the Veterans Health Care Act of 1992. *See* 42 U.S.C. § 256b; *see also* Pub. L. No. 102-585, § 602(a), 106 Stat. 4943, 4967 (1992).

28. The purpose of the federal 340B Program is to "reduce pharmaceutical costs for safety-net medical providers and the indigent populations they serve" by creating "a low-cost source of pharmaceutical medication for the indigent patients themselves." Connor J. Baer, *Drugs for the Indigent: A Proposal to Revise the 340B Drug Pricing Program*, 57 Wm. & Mary L. Rev. 637, 638 (2015) (footnote omitted).

29. Before Congress created the 340B Program, individual manufacturers voluntarily provided their drugs at reduced prices to institutions that served needy and vulnerable patients. In 1990, Congress passed a statute called the Medicaid Rebate Act, which had the unintended consequence of creating disincentives for manufacturers to continue providing those voluntary discounts. H.R. Rep. No. 102-384, pt. 2, at 9-10 (1992). Through the Veterans Health Care Act, Congress remedied that unintended disincentive and established the federal 340B Program, turning the manufacturers' previous voluntary support into a federal mandate.

30. The 340B statute requires any manufacturer participating in the federal Medicaid Drug Rebate Program (and Medicare Part B) to "offer" its covered outpatient drugs "for purchase" at deeply discounted prices to eligible "covered entities"—disproportionate share hospitals and other service providers that are expected to serve predominantly low-income and vulnerable patients. 42 U.S.C. §§ 256b(a)(1), 1396r-8.

31. The statute expressly limits participation in the 340B Program to "covered entities." *See id.* § 256b(a)(4). The statute defines "covered entities" to include only fifteen types of organizations and service providers that are supposed to predominantly serve low-income patients. The definition includes, for example, disproportionate share hospitals ("DSH hospitals"), federally qualified health centers, children's hospitals, qualifying rural hospitals, and clinics that serve vulnerable patients. *Id*. For-profit commercial pharmacies are not included in the statutory list of "covered entities." *Id*. Nor does the 340B statute include any provision authorizing covered entities to purchase manufacturers' drugs and dispense them through commercial pharmacies. *See AstraZeneca Pharms. LP v. Becerra*, 543 F. Supp. 3d 47, 60 (D. Del. 2021) ("It is hard to believe that Congress enumerated 15 types of covered entities with a high degree of precision and intended

10

to include contract pharmacies as a 16th option by implication."), *aff'd sub nom.*, *Sanofi*, 58 F.4th at 703.

32. The discounted 340B price for each of the manufacturers' drugs is calculated by subtracting the drug's Medicaid unit rebate amount from its Average Manufacturer Price, as determined under the federal Medicaid Drug Rebate Program, codified at Section 1927 of the Social Security Act. 42 U.S.C. § 256b(a)(1)-(2), (b). The resulting prices, called 340B "ceiling prices," are significantly lower than the prices at which manufacturers sell their products to other purchasers. For the vast majority of innovator drugs, the mandatory discounts range from at least 23.1% to more than 99.9% of the average price in the market. *See* 42 U.S.C. §§ 1396r-8(c), 256b(a)(1). For AbbVie, these steep mandatory discounts require offering some medications for a penny per unit of drug. Inclusive of penny-priced drugs, the average mandated discount across AbbVie's pharmaceutical portfolio is over 60% of the pharmaceutical's commercial price.

33. To indicate their agreement to participate in the federal 340B Program and comply with its requirements, manufacturers sign a form contract with HHS called a Pharmaceutical Pricing Agreement ("PPA").

34. The PPA imposes no obligation on participating manufacturers to make unconditional sales to covered entities. Additionally, the PPA neither requires manufacturers to sell discounted drugs to contract pharmacies nor to facilitate the transfer of their discounted drugs to contract pharmacies. Nor does it grant covered entities any unfettered right to access to manufacturers' drugs at discounted prices through contract pharmacies.

35. Both the PPA and the federal 340B statute are structured to prevent commercial parties from participating in the federal 340B Program or from profiting off the sale of manufacturers' drugs at discounted prices. Over the past decade, however, that is exactly what

11

has happened as a result of covered entities entering into contractual relationships with commercial pharmacies. Under these arrangements, instead of using manufacturers' deeply discounted drugs to treat indigent and uninsured patients who visit and receive healthcare services from covered entities, commercial contract pharmacies sell manufacturers' drugs at regular prices to pharmacy customers and then demand that their stocks be replenished with drugs purchased by covered entities through the federal 340B Program at discounted prices, pocketing the difference (the "spread") for their own financial benefit. Covered entities themselves acknowledge that this is how the process works, including in recently filed lawsuits alleging 340B misconduct by CVS, one of America's largest pharmacy chains and beneficiaries of the replenishment model. *E.g.*, Complaint ¶¶ 79-84, *Univ. of Mich. Hosps. & Health Ctrs. v. CVS Health Corp.*, No. 2:26-cv-11618 (E.D. Mich. May 18, 2026) ("UMich Compl.").

36. In recent years, commercial contract pharmacies have earned over ***$3.3 billion*** annually in "spread." In 2023, just five pharmacy chains cumulatively earned nearly $3 billion in 340B profits. Adam J. Fein, *EXCLUSIVE: For 2023, Five For-Profit Retailers and PBMs Dominate an Evolving 340B Contract Pharmacy Market*, Drug Channels (July, 11, 2023), https://tinyurl.com/yfcruj9b; *see also* Eric Percher et al., Nephron Rsch. LLC, *The 340B Program Reaches a Tipping Point: Sizing Profit Flows and Potential Disruption*, at 3, 30-31 (2020) (concluding that $3.348 billion in 340B discounts were retained as profit by contract pharmacies in 2020 alone). Between 2019 and 2023, Wellpartner, a CVS-owned third-party administrator, generated $1.6 billion in revenue from 340B covered entities alone. U.S. Senate Comm. on Health, Educ., Labor & Pensions, 119th Cong., *Congress Must Act To Bring Needed Reforms To The 340B Drug Pricing Program* 26-27 (Apr. 2025) ("Cassidy Report"), https://tinyurl.com/44c6w2en. In

covered entities' words, major contract pharmacies like CVS "profit[] handsomely from the 340B Program." *E.g.*, UMich Compl. ¶ 21.

37. These abuses of the federal 340B Program violate the letter and spirit of the federal 340B statute. Congress designed the 340B statute with the intent that there would be a close nexus between the federal drug pricing program and its only valid public purpose—helping low-income and uninsured patients (*i.e.*, the public) obtain access to medications at discounted prices. Consistent with that intent, the statute prevents covered entities from using manufacturers' drugs to generate commercial profits or letting the drugs be transferred or sold to benefit entities outside the Program.

38. The federal statute expressly forbids "diversion" by prohibiting covered entities from selling or otherwise transferring any manufacturer's discounted drugs "to a person who is not a patient of the entity." 42 U.S.C. § 256b(a)(5)(B) ("With respect to any covered outpatient drug that is subject to an agreement under this subsection, a covered entity shall not resell or otherwise transfer the drug to a person who is not a patient of the entity.").

39. The statute also prohibits covered entities from receiving or causing "duplicate discounts or rebates." They may not obtain a 340B discount and cause a Medicaid rebate to be paid by the manufacturer for the same unit of drug. *Id*. § 256b(a)(5)(A).

40. The 340B statute imposes an affirmative duty on the Secretary of HHS—through authority delegated to HRSA—to protect the Program's integrity by "provid[ing] for improvements in compliance by covered entities … in order to prevent diversion" and violations of the statute's duplicate discount prohibition. *Id.* § 256b(d)(2)(A).

41. The statute provides mechanisms for resolving administrative disputes between manufacturers and covered entities through audits and a federal ADR process. *See id.*

§ 256b(d)(l)(B)(v), (d)(3). HRSA has issued a final rule setting forth additional details of the congressionally prescribed 340B ADR process. *See* 89 Fed. Reg. 28,643 (April 19, 2024). The final rule established a comprehensive scheme to resolve disputes between manufacturers and covered entities arising under the 340B statute. Under the rule, "340B ADR Panels" constituted of 340B "subject matter experts" are tasked with resolving not only disputes about drug prices but also "claims that a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price." *Id.* at 28,644, 28,649; *see also* 42 C.F.R. § 10.21(a). HRSA understands those claims to encompass complaints with "manufacturers placing restrictions on certain covered entities use of contract pharmacies," *see* 89 Fed. Reg. at 28,644, the exact issue H.B. 2371 seeks to address. ADR panel decisions are binding, final, and subject only to deferential review by federal courts. *See* 42 U.S.C. § 256b(d)(3)(C); *Astra*, 563 U.S. at 122 ("Congress thus opted … to render the agency's resolution of covered entities' complaints binding, subject to judicial review under the APA."). And HRSA ADR panels adjudicate claims by covered entities challenging the legality of manufacturers' contract pharmacy policies. 340B ADR Decision Summaries, HRSA (May 6, 2026), https://tinyurl.com/yybjmha3.

42. The statute entrusts enforcement of the 340B Program exclusively to the Secretary of HHS and details what penalties may apply. *See* 42 U.S.C. § 256b(a)(5)(C)-(D), (d)(l)(B)(v), (d)(3). As the Supreme Court reasoned in *Astra*, Congress made HHS administrator of both the Medicaid Drug Rebate Program and the 340B Program, and private enforcement by covered entities "would undermine [HHS's] efforts to administer both Medicaid and § 340B harmoniously and on a uniform, nationwide basis." *Astra*, 563 U.S. at 119-20. Enforcement by the Illinois Attorney General would necessarily have the same undermining effect.

14

43.     Failure to comply with the statutory requirements under the 340B Program may result in termination of the PPA (and the manufacturer's ability to participate in Medicaid and Medicare) and potentially the imposition of large civil penalties.  *See* 42 U.S.C. § 256b(a)(5)(D), (d)(1)(B)(vi), (d)(2)(B)(v), (d)(3)(A).

### B.     The Growth in Contract Pharmacy Arrangements

44.     In 1996, HRSA issued non-binding guidance stating that the agency would not prevent covered entities that lacked an in-house pharmacy from entering into a contractual relationship with a single outside pharmacy to dispense covered outpatient drugs to the covered entity's patients.  61 Fed. Reg. 43,549 (Aug. 23, 1996).  The guidance made clear that it "create[d] no new law and create[d] no new rights or duties."  *Id.* at 43,550.

45.     Guidance documents, such as the 1996 guidelines, are by definition general statements of policy that are non-binding, non-enforceable, and do not create any legal rights or obligations.  They are intended instead to inform the public as to how HRSA intends to exercise its enforcement discretion.

46.     In 2010, HRSA issued new non-binding guidance that radically changed how covered entities operated under the 340B Program.  The guidance stated, for the first time, that the agency recommended manufacturers allow covered entities to enter into contractual relationships with an ***unlimited*** number of "contract pharmacies," even if the covered entity had an in-house pharmacy of its own.  75 Fed. Reg. 10,272 (Mar. 5, 2010).

47.     Like the 1996 guidance, the 2010 guidance did not impose binding obligations on manufacturers.  Indeed, HRSA again made clear that the non-binding guidance created no new rights and imposed no new obligations.  *See id.* at 10,273 ("This guidance neither imposes additional burdens upon manufacturers, nor creates any new rights for covered entities under the

law."). In other words, while HRSA indicated that it would not interpret the 340B statute to prohibit covered entities from using multiple contract pharmacies, it did not purport to impose any obligation on manufacturers to transfer drugs to contract pharmacies or otherwise facilitate covered entities' use of contract pharmacies.

48.     Following issuance of the 2010 guidance, covered entities, including in Illinois, dramatically increased their use of contract pharmacies. A recent study reported an increase of 12,000% between 2010 and 2024. *See* Elanor Blalock, *For-Profit Pharmacy Participation in the 340B Program: 2025 Update*, BRG 3 (Jan. 2025) ("BRG Report"), https://tinyurl.com/mrxzr87f. As of 2023, over 33,000 pharmacy locations—"more than half of the entire U.S. pharmacy industry"—acted as 340B contract pharmacies, up from fewer than 1,300 pharmacy locations in 2010. *See* Cassidy Report, *supra*, at 3. This explosion in the use of contract pharmacies has been driven by the prospect of sharing in the outsized profit margins on manufacturer-subsidized 340B-discounted drugs. For example, in 2009, sales of 340B-priced drugs totaled just $4.2 billion, but by 2023 they had increased by more than 30-fold to $124 billion. *See* Karen Mulligan, *The 340B Drug Pricing Program: Background, Ongoing Challenges and Recent Developments*, USC Schaeffer Ctr. For Health Pol'y & Econ. 5 (Oct. 2021) ("Mulligan"), https://tinyurl.com/3a5h2zex; Rory Martin & Harish Karne, *The 340B Drug Discount Program Grew to $124B in 2023*, IQVIA (2024), https://tinyurl.com/ywkdbbju. In covered entities' words, "for-profit pharmacies … have seized on the opportunity [created by HRSA's 2010 guidance] to capitalize on substantial 340B drug discounts" and allow their parent companies to "realize substantial profits by looting a federal drug pricing program designed to aid non-profit 340B providers caring for the most resource-strapped and vulnerable patients." UMich Compl. ¶ 55.

16

49. Similarly, the number of covered entities participating in the Program jumped from around 15,000 in 2010 to more than 50,000 by 2020. *See* Mulligan, *supra*, at 4; U.S. Gov't Accountability Off., *Increased Oversight Needed to Ensure Nongovernmental Hospitals Meet Eligibility Requirements*, GAO-20-108, at 23 (2019), https://www.gao.gov/assets/d20108.pdf ("Given the weaknesses in HRSA's oversight, some hospitals that do not appear to meet the statutory requirements for program eligibility are participating in the 340B Program and receiving discounted prices for drugs for which they may not be eligible."). The number covered entities participating in the 340B Program within Illinois has similarly skyrocketed.

50. Nor does the Program's explosive growth correlate with an increase in indigent patients, or improvements in care and patient outcomes. Indeed, since 2010, the percentage of uninsured patients in the United States has fallen by nearly 38%. *See* Kenneth Finegold et al., U.S. Dep't of Health & Hum. Servs., Off. of the Assistant Sec'y for Planning & Evaluation, *Trends in the U.S. Uninsured Population*, 2010-2020, Issue Brief No. HP-2021-02, at 2 (Feb. 11, 2021), https://tinyurl.com/4rf9cm8t. Moreover, both nationally and in Illinois specifically, much of the 340B Program's growth has occurred in more affluent areas rather than in more socioeconomically disadvantaged areas. And greater participation in the 340B Program does not typically bring about greater safety net engagement, as measured by uncompensated care, patient health outcomes, specific service offerings, or charity care.

51. Contract pharmacies, which are predominantly large commercial pharmacy chains, do not operate like in-house pharmacies, do not themselves qualify as covered entities, and do not owe fiduciary duties to the covered entities. *See* Fein, *supra* (stating that five pharmacy chains account for 75% of all 340B contract pharmacy relationships). The relationships between covered entities and the for-profit, commercial pharmacies are governed by arm's-length contracts.

17

Contract pharmacies are not "agents" of the covered entities; they are merely business partners. Large contract pharmacies like CVS and Walgreens charge "complex fees for pharmacy and administrative services to covered entities" that increase year over year. Cassidy Report, *supra*, at 18. Importantly, these arrangements do not exist outside the context of the federal 340B Program, as there is no other context in which commercial pharmacies are able to share in the "spread" generated by selling manufacturers' discounted 340B drugs to their customers at full prices.

52. That business partnership has come under increasing strain. Covered entities have sued their contract-pharmacy partners for "conspir[ing] to redirect a substantial portion of … 340B [revenues] to themselves." *See, e.g.*, UMich Compl. ¶ 3; *see also id.* ¶ 152 (alleging that CVS pockets nearly 60 percent of 340B revenue).

53. Contract pharmacy arrangements generally use one of two inventory models: (1) pre-purchased inventory or (2) replenishment.

54. A few contract pharmacies use the pre-purchased inventory model, in which a covered entity's 340B-purchased drugs are kept in stock at the contract pharmacy, and when filling prescriptions on behalf of that covered entity, the contract pharmacy uses the covered entity's 340B-purchased inventory.

55. Most contract pharmacies, however, use what is known as the "replenishment" model, which involves the "transfer" of 340B-priced drugs to contract pharmacies with the full knowledge that those drugs will be sold to any customer who comes in the door, whether 340B-eligible or not.

56. Under the replenishment model, no 340B-purchased drugs are kept in stock at the contract pharmacy. Instead, "the pharmacy has an initial stock of drugs" obtained through ordinary

commercial purchases at the non-340B price (Figure 1, step 1). *See AbbVie Inc. v. Murrill*, No. 6:23-CV-01307 (W.D. La. June 6, 2024), Summ. J. Hr'g Tr. at 60 (Ron Connelly, counsel for the Louisiana Primary Care Association). Initially, the contract pharmacy fills all prescriptions using its own non-340B purchased inventory (that is, full price inventory)—including those prescriptions issued by covered entities. As explained below, the pharmacy determines which previous dispenses were 340B eligible and once sufficient eligible dispenses for a particular drug accumulate, the covered entity orders additional quantities of that drug at the federal 340B price (Figure 1, step 6). The covered entity directs AbbVie to transfer those drugs to the contract pharmacy to "replenish" the non-340B-priced drugs dispensed by the contract pharmacy on the covered entity's behalf (Figure 1, step 2). *See* Decl. of RADM Krista M. Pedley, Dir., Off. of Pharmacy Affs., HRSA, *Eli Lilly & Co. v. Becerra*, No. 1:21-cv-00081, ECF 125-2 ¶¶ 3-11 (S.D. Ind.). Sometimes the contract pharmacy actually places the order on behalf of the covered entity for more drugs at the federal 340B price.

**Figure 1.** Replenishment Model Step-By-Step.



57. Once the contract pharmacy receives the replenishment order, the 340B-priced drugs are "placed on the shelf, become[] 'neutral inventory,' and may be dispensed to any subsequent patient" (Figure 1, step 3). *See id.* ¶ 11.

58. In other words, under the replenishment model, contract pharmacies do not keep a separate inventory of 340B-priced drugs but instead dispense drugs to both 340B and non-340B patients alike out of their general inventories. Nor do most contract pharmacies attempt to determine prior to or at the point of sale whether the patient is eligible for a 340B-discounted drug. In almost all instances, contract pharmacies dispense the 340B-priced drugs to their customers at full price without knowledge as to whether, at the time of dispensing, that patient is a 340B-eligible patient (Figure 1, step 4). *See, e.g.*, UMich Compl. ¶ 82 ("Contract Pharmacies do not determine prior to or at the point of sale whether the patient is eligible for 340B-discounted drugs. Instead, 340B determination occurs on the back-end, after the drugs have already been dispensed by the pharmacy, or in this case the Contract Pharmacy, to the 340B eligible patient."). The contract pharmacy or a Third-Party Administrator ("TPA") carries out a 340B determination at the back end, well after a drug has been dispensed to (and likely consumed by) the patient. This determination is made, typically by a TPA that contracts with both the covered entity and the contract pharmacy, using a black-box algorithm unknown by AbbVie (Figure 1, step 5). If those criteria are designed correctly, the post-sale determination may be able to calculate how many 340B-priced drugs AbbVie must sell. But in reality, the 340B-eligibility criteria applied by covered entities, contract pharmacies, and their TPAs varies widely, including with respect to lookback periods, patient-eligibility windows (*i.e.*, how long after an office visit a person will be considered a patient) and referral capture (*i.e.*, when a 340B covered entity can treat as 340B-eligible prescriptions written by a ***non-340B*** physician to whom the covered entity referred the

patient). As the D.C. Circuit observed, "[t]he covered entity, the pharmacy, and the third-party administrator often divvy up the spread between the discounted price and the higher insurance reimbursement rate. Each of these actors thus has a financial incentive to catalog as many prescriptions as possible as eligible for the discount." *Novartis*, 102 F.4th at 457-58.

59. The replenishment model also encourages diversion by allowing covered entities to transfer federally discounted drugs to pharmacies, who are not "a patient of the entity." *See* 42 U.S.C. § 256b(a)(5)(B).

60. Although HRSA interpreted the federal 340B statute to allow the use of pharmacies, it did so because it "believe[d] that the relationship between the covered entity and the contract pharmacy is one of agency." 61 Fed. Reg. at 43,554. Additionally, HRSA assumed that the covered entities purchasing the drugs would retain title to and responsibility for the drugs even after directing shipment to the contract pharmacy. *Id.* at 43,553. In practice, however, covered entities and contract pharmacies do not have an agency relationship, and covered entities do not retain title to or control over the drugs.

61. As explained above, contract pharmacies (typically through a TPA) instruct covered entities to place orders—sometimes even placing the order itself without going through a covered entity—of additional quantities of drugs at the discounted 340B price to "replenish" the general inventories that they will use to supply non-340B-eligible sales. Significantly, as a result of such replenishment, even though the drugs are purchased by or on behalf of covered entities, contract pharmacies effectively, if not actually, take title to the drugs. At no point in time does a covered entity take title to the drugs under this model. *See Sanofi Sues HHS, HRSA for Contract Details Between Covered Entities, Pharmacies*, 340B Report (June 13, 2024), https://tinyurl.com/bdmx88wu (according to a covered entity spokesperson, "in order for the

replenishment model to function, 'the title to 340B drugs transfers to the contract pharmacy at the time it is taken into inventory'"). AbbVie is also not aware of any instance where a contract pharmacy or covered entity represents that an agency relationship exists between them such that the contract pharmacy acts at the direction of a principal covered entity.

62. In practice, therefore, covered entities and contract pharmacies share in the "spread" generated by selling the drugs at higher prices to pharmacy customers and/or seeking full commercial reimbursement from the patients' insurance plans. For-profit, commercial pharmacies thereby obtain significant profits from selling the 340B covered outpatient drugs that manufacturers must offer to covered entities at deeply discounted prices. Indeed, by some standards, contract pharmacies' profits are so significant that further expansion of contract pharmacy use is unlikely to markedly increase covered entities' revenues.

63. By dramatically expanding the pool of individuals who can access the discounted drugs that covered entities can buy at discounted prices—including individuals who do not qualify as patients of the covered entity—covered entities and commercial pharmacies can obtain profits that extend far beyond Congress's intent when it created the 340B Program. One study found that in 2023 alone, covered entities and their contract pharmacies generated approximately $64 billion in estimated gross profits from the purchase of manufacturers' drugs at mandated 340B prices. *See* BRG Report, *supra*, at 10. And a recent report from the U.S. Senate Committee on Health, Education, Labor & Pensions found that a covered entity in Virginia generated $276.5 million in 340B savings and revenue from September 2018 through September 2023, while another covered entity in Ohio accrued $933.7 million in 340B savings and revenue from April 2020 through June 2023. Cassidy Report, *supra*, at 6.

22

64. When commercial pharmacies are brought into the Program, there is a significantly greater risk that manufacturers' discounted drugs will be dispensed to individuals who are not "patients" of the covered entity. As HHS has found, contract pharmacy arrangements "create complications in preventing diversion" (for example, contract pharmacies cannot verify patient eligibility in real time like a covered entity can). HHS Office of Inspector General, *Contract Pharmacy Arrangements in the 340B Program*, OEI-05-13-00431, at 1 (2014) ("HHS Report"), https://oig.hhs.gov/oei/reports/oei-05-13-00431.pdf.

65. Because contract pharmacies often dispense 340B covered outpatient drugs from the same inventory as drugs dispensed to all other customers (and seek replenishment after the fact), the opportunities for unlawful distributions to ineligible patients increase, allowing covered entities and contract pharmacies to profit from the diversion that Congress intended to prohibit. *See* U.S. Gov't Accountability Off., *Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement*, GAO-18-480, at 44 (June 2018), https://www.gao.gov/assets/d18480.pdf (noting that approximately two-thirds of diversion findings in HRSA audits involved drugs distributed at contract pharmacies); *id.* at 35, 43-44 (finding 45% of covered entities that responded to a recent GAO survey admitted they do not provide any discount to patients who use their contract pharmacies, and many of the remaining 55% reported rarely giving discounts to patients obtaining medicines through contract pharmacies).

66. Covered entities increasingly agree that contract pharmacies thwart compliance efforts. For example, one large covered entity alleges that CVS "***terminated*** [the entity] from the 340B contract pharmacy arrangement, in retaliation for uncovering [a] fraudulent scheme … and

seeking to fulfill their obligations under the 340B Program and HRSA regulations." *See, e.g.*, UMich Compl. ¶ 24.

67.     Covered entities and commercial pharmacies reap windfalls from gaining access to manufacturers' drugs at deeply discounted prices under the federal 340B Program, but uninsured and underinsured patients are not benefitting. *See* HHS Report, *supra*, at 2 (finding that "some covered entities in our study do not offer the discounted 340B price to uninsured patients at their contract pharmacies"); Cassidy Report, *supra*, at 9 (explaining that the covered entities under investigation "do not pass 340B discounts directly to their patients and differ on how patients receive discounts on their 340B drugs"); Adam J. Fein, *The Federal Program that Keeps Insulin Prices High*, Wall St. J. (Sept. 10, 2020), https://tinyurl.com/yxehpc7v (explaining that "almost half the U.S. pharmacy industry now profits from the 340B program, which is designed as a narrow support to certain hospitals," while patients "don't benefit," even though manufacturers have "practically given the product away"); Rory Martin & Kepler Illich, *Are Discounts in the 340B Drug Discount Program Being Shared with Patients at Contract Pharmacies?*, IQVIA 12 (Sept. 27, 2022), https://tinyurl.com/2wdtuh52 ("The 340B Drug Discount Program as it exists today is a complex system of arbitrage … in which most vulnerable patients at contract pharmacies do not get drug discounts."); Lin JK et al., *Assessment of US Pharmacies Contracted with Health Care Institutions Under the 340B Drug Pricing Program by Neighborhood Socioeconomic Characteristics*, JAMA Health Forum 2 (June 17, 2022), https://tinyurl.com/4kvyn9ky (finding that contract pharmacy growth from 2011 to 2019 was concentrated in affluent and predominantly White neighborhoods and that the share of 340B pharmacies in socioeconomically disadvantaged and primarily non-Hispanic Black and Hispanic/Latino neighborhoods declined).

68. For example, the North Carolina Department of the State Treasurer published a recent report explaining that "some hospitals are using the 340B program to enrich themselves rather than to serve vulnerable communities," and that the hospitals "expanded into wealthier neighborhoods with a higher percentage of insured individuals who could pay more for the drugs." Dale R. Folwell, N.C. Dep't of State Treasurer, *Overcharged: State Employees, Cancer Drugs, and the 340B Drug Pricing Program*, N.C. State Health Plan 3, https://tinyurl.com/4cy8an69. Illinois is no different: nearly half of Illinois contract pharmacies are located in affluent neighborhoods. *See* Cmty. Access Nat'l Network, *Illinoisians Deserve Transparency and Accountability on 340B* (2024), https://tinyurl.com/wwmer2ts.

69. While commercial pharmacies are driving massive growth in the 340B Program—at double-digit annual rates—charity care by hospitals has decreased. Commentators have noted, for example, that as the 340B Program has grown at a remarkable rate, the total value of hospitals' uncompensated care has significantly declined. *See* Letter from Adam J. Fein to Hon. Lamar Alexander and Hon. Greg Walden in response to request for input on 340B drug pricing program, 7-8 (Oct. 30, 2020), https://tinyurl.com/4s5ptxxy; Adam J. Fein, *EXCLUSIVE: 340B Program Purchases Reach $24.2 Billion—7%+ of the Pharma Market—As Hospitals' Charity Care Flatlines*, Drug Channels (May 14, 2019), https://tinyurl.com/4z8dmjsv.

70. Both the *New York Times* and *Wall Street Journal* have run exposés describing the flaws in contract pharmacy arrangements—flaws that enable large scale arbitrage and damage the very communities that the federal 340B Program was designed to help. *See* Katie Thomas & Jessica Silver-Greenberg, *Profits Over Patients: How a Hospital Chain Used a Poor Neighborhood to Turn Huge Profits*, N.Y. Times (Sept. 24, 2022), https://tinyurl.com/3sbxuswa (describing how one 340B hospital "has been slashing services at Richmond Community while

investing in the city's wealthier, white neighborhoods, according to more than 20 former executives, doctors and nurses"); Anne Wilde Mathews et al., *Many Hospitals Get Big Drug Discounts. That Doesn't Mean Markdowns for Patients*, Wall St. J. (Dec. 20, 2022), https://tinyurl.com/yc2uc6yp ("The data show that hospitals often extend their 340B discounts to clinics in well-off communities, where they can charge privately insured patients more than those on Medicaid" which "raise questions about the program's growth and purpose.").

71. A recent *New York Times* investigation into Apexus, the government contractor managing 340B drug pricing, exposed systemic price manipulation, lack of oversight, and financial exploitation within contract pharmacy arrangements—allowing for significant financial abuse at the expense of the communities the Program was meant to protect. Apexus, which is responsible for negotiating better prices and access to mediations, has a direct financial incentive to expand the Program and maximize hospital profits. Because Apexus "is allowed to collect a fee for almost every drug sold under the program," it has actively developed strategies to drive 340B sales and increase covered entity revenue. These strategies include training covered entities on how to maximize 340B revenue; operating a "purchasing optimization team"; advising hospitals on which drugs generate the highest margins; and running a certification program teaching hospitals how to capture more patients and prescriptions under 340B. These tactics have prioritized profit generation over patient benefit, increasing Apexus's and covered entities' financial gains at the expense of patients, insurers, and manufacturers. Hospitals face no restrictions on which outpatient prescriptions they classify as 340B, allowing them to mine patient records from as far back as 36 months to claim additional patients under the Program—even if those patients never directly benefit from the discounts. In some cases, hospitals have passed inflated drug costs onto patients instead of sharing the savings. *See* Ellen Gabler, *How a Company Makes Millions Off a*

26

*Hospital Program Meant to Help the Poor*, N.Y. Times (Jan. 15, 2025), https://tinyurl.com/33ftpfdf.

72. Congress has also expressed concern over growing abuses in the 340B Program. On April 24, 2025, the Majority Staff of the Senate Health, Education, Labor & Pensions ("HELP") Committee, chaired by Senator Cassidy, released a report titled "Congress Must Act to Bring Needed Reforms to the 340B Drug Pricing Program,"—the culmination of a nearly two-year investigation into contract pharmacy arrangements and other 340B-related issues. In its findings, the Senate HELP Committee determined that not only have contract pharmacies grown by sheer numbers but major commercial pharmacy chains like CVS, Walgreens, Express Scripts, OptumRx, and Walmart account for 75% of all contract pharmacy relationships. *See* Cassidy Report, *supra*, at 3.

73. As part of the Senate HELP Committee's investigation, several covered entities expressly told Congress that they do not pass on discounts to patients and do not specifically account for 340B revenue in their budgets. *See id.* at 10. And large commercial pharmacy chains like CVS and Walgreens disclosed that they collect significant fees associated with 340B dispensing. For example, for patients with third-party insurance, CVS collects a "dispensing fee for brand name drugs" of "$35 for a 1-30 day supply, $60 for a 31-60 day supply, and $85 for a 61-90 day supply." *Id.* at 18. CVS reported to the Committee that in 2023, it made $382 million in 340B-related dispensing fees and "annual gross and net revenues generated from the 340B program." *Id.* at App. 106. Operating as contract pharmacies is so lucrative that CVS and Walgreens disclosed manufacturers' 340B-abuse reform efforts as a material risk to their business in their annual reports. *See* CVS Pharmacy 10-K (2022) at 22, https://tinyurl.com/mpwpre9x; Walgreens, Inc. 10-K (2022) at 28, https://tinyurl.com/mu6tfzcu.

74. While the replenishment model contributes to the abuses described above—issues manufacturers are rightfully trying to address—H.B. 2371 goes further: it mandates that manufacturers sell or transfer discounted drugs on terms Congress never required and that manufacturers never agreed to. The injuries manufacturers face under H.B. 2371 do not stem from the 340B Program itself or even from the replenishment model specifically, but from Illinois's attempt to override federal law and impose *State* requirements on AbbVie's participation in a *federal* program. After all, federal law allows the manufacturer polices that H.B. 2371 bars. *See Sanofi*, 58 F.4th at 701; *Novartis*, 102 F.4th at 463-64. And even if the replenishment model were eliminated entirely, H.B. 2371 would still compel manufacturers to transfer property under conditions they oppose, stripping them of their federal statutory right to impose reasonable limitations on their 340B offers. In doing so, H.B. 2371 not only conflicts with federal law—it also effects a taking. The statute forces manufacturers to sell valuable property at below-market rates, to third parties, with no room to impose conditions or decline a sale.

**C.** **AbbVie's and Other Manufacturers' Response to HRSA's Overreach**

75. AbbVie and other manufacturers have exercised their lawful right to decline covered entity requests that manufacturers provide their discounted 340B-priced drugs to an unlimited number of commercial pharmacies.

76. AbbVie has implemented initiatives making clear that it will not indiscriminately accept requests that it transfer 340B-discounted drugs to an unlimited number of third-party commercial contract pharmacies servicing covered entities.

77. As 340B abuse continued to grow, with covered entities seeking the provision of 340B-priced drugs to an excessive number of for-profit pharmacies—sometimes located more than 1,000 miles from the covered entity's location—AbbVie updated its policy to place reasonable

limits around provision to contract pharmacies. Specifically, if a covered entity has its own in-house pharmacy, AbbVie's policy now is to only take orders for the in-house pharmacy. However, if a covered entity does not have an in-house pharmacy capable of dispensing to outpatients, AbbVie will take orders for one designated contract pharmacy, provided that the one contract pharmacy is located within 40 miles of the HRSA-registered covered entity parent site, and that the covered entity submits limited claims data on 340B utilization for that pharmacy location. In addition, Grantee Covered Entities may use an unlimited number of contract pharmacies as long as the Grantee registers with 340B ESP[TM], a web-based platform made available to covered entities at no cost, and submits claims data. *See* Ltr. from E. Scheidler to 340B Covered Entities (May 5, 2026), https://tinyurl.com/35zxka54 (most recent version of AbbVie's policy).

78.     In implementing its initiatives, AbbVie has confirmed that it will continue to offer "each covered entity" the ability to "purchase" its covered outpatient drugs "at or below the applicable ceiling" price set by statute. *See* 42 U.S.C. § 256b(a)(1). AbbVie is committed to ensuring that each hospital covered entity has at least one pharmacy location where it can receive shipments of discounted AbbVie medicines, and out of which it can dispense AbbVie's 340B-discounted drugs to qualifying patients. If a hospital covered entity is unable to identify an eligible contract pharmacy within 40 miles, AbbVie will work with the covered entity to identify a suitable alternative.

79.     AbbVie's contract-pharmacy policy is a pre-sale offer condition that covered entities must agree to in order to purchase AbbVie's drugs at a 340B discount. If a covered entity placed a 340B-priced purchase order for a pharmacy other than its in-house pharmacy or single designated outside contract pharmacy, AbbVie would reject the order and deny 340B pricing before any sale was completed.

29

80.     AbbVie's policy is consistent with those upheld by the Third and D.C. Circuits. *See Sanofi*, 58 F.4th at 701; *Novartis*, 102 F.4th at 463-64.

81.     In addition to AbbVie, many other pharmaceutical manufacturers have adopted policies directed at addressing abuses of the 340B Program by covered entities and contract pharmacies.

**D.      Litigation in Federal Courts**

82.     After the D.C. and Third Circuits held that manufacturers' abuse-prevention policies are lawful under the federal scheme, *see Novartis*, 102 F.4th at 463-64; *Sanofi*, 58 F.4th at 701, several States enacted their own laws trying to prohibit such policies.  Those State laws—passed in Arkansas, Colorado, Hawaii, Louisiana, Maine, Maryland, Minnesota, Mississippi, Missouri, Nebraska, New Mexico, North Dakota, Oklahoma, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, Washington, and West Virginia—eliminate manufacturers' ability to condition their 340B offers and force manufacturers to transfer their drugs to an unlimited number of contract pharmacies at the 340B-discounted prices.  A new round of federal litigation commenced.  Manufacturers challenged the laws as unconstitutional on several grounds, and that litigation continues today.

83.     Some courts have allowed the State laws to take effect.  *See, e.g.*, *PhRMA v. McClain*, 95 F.4th 1136 (8th Cir. 2024).  By contrast, the Southern District of West Virginia preliminarily enjoined West Virginia's contract pharmacy law, holding that the law unconstitutionally conflicted with Section 340B.  *Morrisey*, 760 F. Supp. at 451-60.  The West Virginia court found that laws like Illinois's H.B. 2371 regulate "price, not delivery."  *Id.* at 455. Under such laws, "[t]he question is only about what price the pharmacy and the covered entity will pay."  *Id.*  In other words, "the system is about delivery ***at a given price***, not delivery *per se*."  *Id.*

84.     The Western District of Oklahoma also preliminarily enjoined enforcement of Oklahoma's contract pharmacy law, holding that manufacturers were likely to succeed on the merits of both their preemption and takings claims. *Drummond*, 808 F. Supp. 3d at 1273-83. Regarding preemption, the Oklahoma court found that Oklahoma's H.B. 2371 analogue impermissibly regulates price rather than delivery (although it found the "supposed distinction between 'delivery' and 'price' regulations … artificial") and conflicts with the federal 340B Program's dispute resolution mechanism. *Id.* at 1273-79. The Oklahoma court also held that the Oklahoma law effectuates unconstitutional takings on the grounds that it compels sales for a private rather than public purpose and provides no just compensation. *Id.* at 1278-81. Notably, the Oklahoma court rejected the notion that a manufacturer's participation in the ***federal*** 340B Program constituted acquiescence to a ***State's*** appropriation of the manufacturer's property. *Id.* at 1278-79.

85.     The District of North Dakota permanently enjoined North Dakota's contract pharmacy law, concluding that manufacturers had succeeded on the merits of their preemption claims. *Wrigley*, 2026 WL 1133457, at *9-11. The North Dakota court distinguished the Eighth Circuit's *McClain* decision and concluded that "State laws like North Dakota's inhibit the ability of the government to exercise its spending power by deterring manufacturers from participating in the program." *Id.* at *10.

86.     Other cases await decisions in district court, and appeals are now pending before the U.S. Courts of Appeals for the First, Fourth, Fifth, Sixth, Eighth, Ninth, and Tenth Circuits. In the Fourth Circuit, a panel ruled in favor of manufacturers and held that H.B. 2371 analogues in West Virginia and Maryland were preempted due to their targeting of the federal 340B Program and for operationally interfering with the 340B Program. *PhRMA v. McCuskey*, 171 F.4th 675,

695 (4th Cir. 2026), *automatically vacated pending en banc disposition*, 176 F.4th 830 (4th Cir. 2026) (en banc); *AbbVie Inc. v. Brown*, 2026 WL 1005576 (4th Cir. Apr. 14, 2026), *automatically vacated pending en banc disposition*, 176 F.4th 830 (4th Cir. 2026). Those panel decisions are awaiting review by the en banc Fourth Circuit.

87. Recently, the United States filed amicus briefs in federal courts of appeals across the country in support of AbbVie and other manufacturers. *E.g.*, Brief for the United States as Amicus Curiae in Support of Appellants ("DOJ AbbVie Amicus Curiae Brief"), *AbbVie Inc. v. Weiser*, No. 25-1439 (10th Cir. Feb. 25, 2026), ECF 30; Brief for the United States as Amicus Curiae in Support of Appellants and Reversal ("DOJ PhRMA Amicus Curiae Brief"), *PhRMA v. Neronha*, No. 26-1039 (1st Cir. Feb. 26, 2026); Brief for the United States as Amicus Curiae in Support of Appellants and Rehearing En Banc, *AbbVie Inc. v. Murrill*, No. 24-30645 (5th Cir. Apr. 7, 2026), ECF 217. Therein, the United States asserted that laws H.B. 2371 are preempted several times over. That is because such laws (1) "target[] and discriminate[] against manufacturers that participate in a federal program," (2) "arrogate to the State enforcement authority that properly belongs to the federal government alone," and (3) jeopardize Congress's aims by making participation in the 340B Program more burdensome than Congress intended, thus disincentivizing participation in federal healthcare programs. DOJ AbbVie Amicus Curiae Brief, *supra*, at 16-22; *see also* DOJ PhRMA Amicus Curiae Brief, *supra*, at 12, 15.

**E. The Inflation Reduction Act**

88. The Inflation Reduction Act of 2022 established the so-called "Drug Price Negotiation Program" (DPNP). *See* 42 U.S.C. § 1320f.

89. The DPNP requires the Secretary of HHS to set a "maximum fair price" ("MFP") in Medicare for drugs selected under the DPNP. *See id.* § 1320f(a)(3).

90.     If they want to continue participating in Medicare and Medicaid, manufacturers of "selected drugs" are obligated to make the MFP available to all eligible individuals, which generally includes drugs dispensed by hospitals and pharmacies that provide care to Medicare-covered individuals. *Id.* §§ 1320f(c)(2), 1320f-2(a)(3).

91.     Failure to provide access to the MFP can subject a manufacturer to significant civil monetary penalties that can reach into the millions of dollars per day. *Id.* §§ 1320f-6(c), 1320f-2(a)(5).

92.     The Centers for Medicare & Medicaid Services (CMS)—the agency tasked with administering the DPNP—has to-date selected a MFP for one drug that AbbVie manufactures: Imbruvica, which treats certain blood cancers. CMS, *Medicare Drug Price Negotiation Program: Selected Drugs for Initial Price Applicability Year 2026*, https://tinyurl.com/2584m4h7.

93.     The MFP for Imbruvica went into effect on January 1, 2026. *See* CMS, *Medicare Dug Price Negotiation Program: Negotiated Prices for Initial Price Applicability Year 2026*, https://tinyurl.com/mr4c67rz. Two more MFPs for AbbVie's medications, Vraylar and Linzess, will become effective January 1, 2027. *See* CMS, *Medicare Drug Price Negotiation Program: Negotiated Prices for Initial Price Applicability Year 2027*, https://tinyurl.com/bdhfrvb4. One more MFP for AbbVie's medication, Botox, will become effective January 1, 2028. *See* CMS, *Medicare Drug Price Negotiation Program: Selected Drugs for Initial Price Applicability Year 2028*, https://tinyurl.com/4usfx5ev.

94.     Separately, the DPNP contemplates that an individual eligible to receive the MFP for a selected drug may sometimes (or even often) receive the drug at a 340B hospital or contract pharmacy, and that the dispensed drug may also be subject to a PPA under the 340B statute. To that end, the DPNP contains an MFP-340B nonduplication provision. 42 U.S.C. § 1320f-2(d).

That provision obligates the manufacturer of a drug that is subject to both the MFP and a PPA to provide *only* the lower of the two price concessions—but not both. *See id.*

95. CMS has disclaimed any responsibility for identifying and deduplicating MFP-340B dispenses. *See* CMS, *Medicare Drug Price Negotiation Program: Final Guidance, Implementation of Section 1191-1198 of the Social Security Act for Initial Price Applicability Year 2027 and Manufacturer Effectuation of the Maximum Fair Price in 2026 and 2027*, at 231 (Oct. 2, 2024), https://tinyurl.com/ychztdfu ("2027 Guidance") ("CMS will not, at this time, assume responsibility for nonduplication of discounts between the 340B ceiling price and MFP."); *id.* at 54 ("Neither CMS nor the [contract facilitating data flow between CMS, manufacturers, and providers] will verify that a claim was or was not billed as a 340B-eligible drug.").

96. This leaves avoiding duplicate MFP-340B discounts in the hands of manufacturers like AbbVie. Indeed, that is precisely the result that CMS intends: "CMS strongly encourages manufacturers to work with dispensing entities, covered entities and their 340B TPAs, and other prescription drug supply chain stakeholders (e.g., wholesalers) to facilitate access to the lower of the MFP and the 340B ceiling price, wherever applicable." *Id.* at 232.

97. Claims data is the only feasible method for ensuring compliance with the DPNP's nonduplication provisions because it enables manufacturers to quickly and accurately identify which dispenses were both MFP- and 340B-eligible.

## F.    The Illinois Law

98. While the federal 340B statute grants manufacturers the freedom to adopt policies to combat contract pharmacy abuse, Illinois turned to its own legislature to take that freedom away.

99. The Illinois legislature introduced legislation, H.B. 2371, to limit manufacturers' right to attach reasonable conditions to the federal 340B offer made to covered entities. Illinois's

legislature passed H.B. 2371 on June 1, 2026, and Governor Pritzker signed it into law on August 7, 2026. H.B. 2371 took effect upon becoming law. H.B. 2371, § 99.

100. H.B. 2371 compels manufacturers to transfer 340B-discounted drugs to commercial pharmacies:

> No person, including a pharmaceutical manufacturer, may deny, restrict, prohibit, condition, or otherwise interfere with, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B covered entity or a 340B contract pharmacy authorized to receive 340B drugs on behalf of the 340B covered entity unless the receipt is prohibited by federal law.

H.B. 2371 § 15(a). It thereby revokes what the federal 340B statute grants: manufacturers' liberty to adopt terms and policies that prevent unlawful transactions and other abuses of the 340B Program.

101. And H.B. 2371 directly targets manufacturer contract policies that are lawful under federal law: "No person, including a pharmaceutical manufacturer, may impose any restriction on the ability of a 340B covered entity to contract with or designate a 340B contract pharmacy, including restrictions relating to the number, location, ownership, or type of 340B contract pharmacy." *Id*., § 15(b).

102. As a practical matter, H.B. 2371 also expands the pool of entities authorized by Congress to receive drugs purchased at 340B prices. By sweeping in "a 340B contract pharmacy authorized to receive 340B drugs on behalf of the 340B covered entity" drugs, Illinois demands that manufacturers provide commercial contract pharmacies unfettered access to their drugs at discounted 340B prices. *Id.*, § 15(a). But that is contrary to what Congress intended and enacted. *See* 42 U.S.C. § 256b(a)(5)(B) (providing that "a covered entity shall not resell or otherwise transfer the drug to a person who is not a patient of the entity"); *id.* § 256b(a)(4) (defining "covered entity" so as not to include contract pharmacies). That expansion of AbbVie's 340B obligations renders H.B. 2371 not only preempted but also an unconstitutional taking. It is beyond dispute

that commercial pharmacies and their third-party administrators are profiting from 340B-priced sales. And it is also beyond dispute that, without H.B. 2371, AbbVie would complete far fewer 340B-priced sales. As a result, and in the most direct possible sense, Illinois's law forces AbbVie—as part of 340B Program participation—to provide more 340B-priced drugs and the corresponding profits to hospitals, their commercial pharmacies, and commercial third-party administrators than federal law requires.

103. The Illinois Attorney General is empowered to bring enforcement actions against manufacturers for violating H.B. 2371 under his general authority under the Attorney General Act. H.B. 2371, § 40(a). The Attorney General make seek injunctive relief, money damages payable to an aggrieved 340B covered entity, a civil penalty up to $1,000 for each violation of the law, and "any other relief." *Id.*, § 40(b). A manufacturer commits a "separate violation" for "[e]ach individual transaction"—*i.e.*, "transfer of product between persons in which a change of ownership occurs." *Id.*, § 15(d); *see* 21 U.S.C. § 360eee(24)(A) (definition of "transaction" incorporated by reference into H.B. 2371).

104. At the same time, H.B. 2371 makes it all but impossible for AbbVie to ensure rudimentary compliance with the 340B Program and avail itself of federal 340B ADR procedures. Illinois's law states that no "person, including a pharmaceutical manufacturer, may require or compel a 340B covered entity or 340B contract pharmacy to … submit data or information that is not required by a State or federal law as a condition for a 340B covered entity, its 340B contract pharmacy, or a location otherwise authorized by a 340B covered entity to receive 340B drugs." H.B. 2371, § 15(c). As explained further below, however, such data is critical to manufacturers' ability "to utilize the federal dispute resolution system," and thus support HRSA enforcement of

36

340B's requirements. *See Morrisey*, 760 F. Supp. 3d at 453; *see also Drummond*, 808 F. Supp. 3d at 1277-78.

105. Claims data is also essential to AbbVie's ability to comply with both Section 340B and the IRA's DPNP without paying duplicate discounts. Claims data is the best method of tracking discounts at the transaction level. Without claims data, AbbVie cannot quickly and accurately identify which dispenses are eligible for both the 340B- and MFP-price and cannot effectively avoid paying duplicate discounts under the 340B Program and DPNP.

106. H.B. 2371 cites no source, under the 340B statute or elsewhere, that authorizes Illinois to add requirements to the conditions for participating in the federal 340B Program, expand the pool of entities permitted to benefit from 340B pricing, compel the transfer of AbbVie's property at confiscatory prices for private use, or establish an enforcement process that, on the one hand, allows third parties to seek remedies for alleged violations of the federal 340B requirements and, on the other hand, frustrates AbbVie's ability to utilize the enforcement measures Congress created.

107. Illinois has jumped head-first into the 340B Program and expanded that Program's requirements despite not even knowing how the 340B Program operates or who it benefits. On the same day that Illinois's legislature passed H.B. 2371, it passed another bill (H.B. 4327) acknowledging that the 340B Program needs basic "transparency" and commissioning a "study" to learn "how 340B covered entities and pharmaceutical manufacturers within Illinois participate in the 340B Drug Discount Program." H.B. 4327, § 15(a); *see id.* § 15(a). That law empowers the Illinois Department of Insurance ("DOI") to demand that pharmaceutical manufacturers like AbbVie provide information that covered entities keep *hidden* from manufacturers and the public. The DOI may fine manufactures for failing to respond within 30 days of deadlines set by the DOI.

37

For example, the DOI may demand that manufacturers provide information about "the impact of the 340B Drug Discount Program on the patients and the community served by each 340B entity." *Id.* § 15(a)(19). AbbVie is hardly in a position to answer that question. Indeed, most covered entities *themselves* likely do not know how 340B revenue impacts their patients because they do not track where that revenue goes. H.B. 2371 *aggravates* this fundamental lack of transparency by prohibiting manufacturers from collecting claims data and enforcing reasonable restrictions on the number of commercial pharmacies that can profit from the 340B Program behind closed doors.

## STANDING

108. AbbVie is financially injured by H.B. 2371 because H.B. 2371 forces AbbVie to complete more heavily discounted sales than it otherwise would. H.B. 2371 does this by overriding the discretion manufacturers retain under federal law to impose reasonable conditions on their 340B offers and subjecting AbbVie to conflicting obligations, compliance burdens, and potential enforcement actions. The law forces AbbVie to provide its private property to another private party in a constitutionally prohibited A-to-B wealth transfer. The law subjects AbbVie to State enforcement through the Attorney General's power to enforce H.B. 2371 violations in the form of civil suits designed to impose steep financial penalties.

109. AbbVie's injuries are fairly traceable to H.B. 2371 and to the Attorney General because the State statute compels a private transfer of AbbVie's 340B-discounted drugs to hospitals and private, for-profit commercial pharmacies—in the absence of any recognized public use or purpose and in violation of federal law, and only the Attorney General has enforcement authority. H.B. 2371 compels sales at the discounted price against AbbVie's wishes and on terms it would not agree to; in other words, in the absence of H.B. 2371, those sales or other transfers to covered entities and their contract pharmacies at the discounted price would not occur. The statute

prohibits AbbVie from enforcing its contract pharmacy policy, but AbbVie will not sell at the 340B price absent agreement to its contract pharmacy policy. H.B. 2371 thus compels a transaction that would not take place but for the State's law. Put differently, the existence and enforcement of H.B. 2371 results in the difference between a sale at the discounted price occurring or not. In addition, the statute seeks to impose new State-law obligations on drug manufacturers participating in the 340B Program beyond those required by the federal statute. Neither section 340B, nor any existing regulation, nor the PPA, contains these requirements. Moreover, H.B. 2371 purports to authorize the Illinois Attorney General to enforce H.B. 2371 in a way that violates federal law and infringes on AbbVie's property rights.

110.    A favorable ruling is likely to redress AbbVie's injuries. Enjoining enforcement of the provisions of H.B. 2371 that unconstitutionally force the taking of manufacturers' private property for no public use would redress AbbVie's injuries because AbbVie's property would not be unconstitutionally taken, and AbbVie would not be exposed to State-imposed penalties for exercising its rights under the 340B Program and the Constitution. Similarly, a declaratory judgment would redress AbbVie's injuries because AbbVie would not be exposed to enforcement actions, accumulating penalties.

## BASIS FOR INJUNCTIVE RELIEF

111.    Irreparable harm occurs when the "legal remedies available to the movant are inadequate." *A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 774 (7th Cir. 2023). Moreover, monetary losses constitute irreparable harm when monetary damages are unavailable due to sovereign immunity. *Faust v. Vilsack*, 519 F. Supp. 3d 470, 477 (E.D. Wis. 2021); *Cmty. Pharmacies of Ind., Inc. v. Ind. Fam. & Soc. Servs. Admin.*, 801 F. Supp. 2d 802, 806 (S.D. Ind. 2011); *Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 851–52 (9th Cir.

39

2009) ("[B]ecause [the party] will be unable to recover damages [for their monetary losses] … even if they are successful on the merits of their case, they will suffer irreparable harm if the requested injunction is not granted."), *vacated on other grounds sub nom.*, *Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606 (2012); *Entergy Nuclear Vermont Yankee, LLC v. Shumlin*, 733 F.3d 393, 423 (2d Cir. 2013) (finding irreparable harm when plaintiff "would be unable to recover monetary damages from Vermont because of the Eleventh Amendment"); *see also Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013) ("[N]umerous courts have held that the inability to recover monetary damages because of sovereign immunity renders the harm suffered irreparable." (citing *Chamber of Com. v. Edmondson*, 594 F.3d 742, 770-71 (10th Cir. 2010))); *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 765 (2021) ("The moratorium [on collecting rent during the COVID-19 pandemic] has put the applicants, along with millions of landlords across the country, at risk of irreparable harm by depriving them of rent payments with no guarantee of eventual recovery.").

112. The deprivation of constitutional rights unquestionably constitutes irreparable injury. *Petroleum Expl., Inc. v. Pub. Serv. Comm'n of Ky.*, 304 U.S. 209, 218-19 (1938) ("It is true that the injury which flows from the threat of enforcement of an allegedly unconstitutional, regulatory State statute with penalties so heavy as to forbid the risk of challenge in proceedings to enforce it, has been generally recognized as irreparable and sufficient to justify an injunction."). Because H.B. 2371 violates AbbVie's constitutional rights, AbbVie will suffer irreparable harm absent an injunction.

113. A taking occurs each and every time a drug manufacturer is compelled to transfer its drugs at the 340B-discounted price to a commercial pharmacy for the private benefit of that for-profit pharmacy. Effecting an unconstitutional taking of AbbVie's private property in a forced

40

transfer to another private party for no recognized public use or purpose constitutes an irreparable injury.

114. Further, if H.B. 2371 is not enjoined, AbbVie would be exposed to additional State law requirements as a condition of participating in the federal 340B Program. A party may be irreparably injured in the face of the threatened enforcement of a preempted law. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1022 (9th Cir. 2013) (granting preliminary injunction where federal immigration law preempted State law aiding unauthorized aliens); *Metro. Taxicab Bd. of Trade v. City of N.Y.*, 615 F.3d 152 (2d Cir. 2010) (affirming preliminary injunction of city regulations preempted by federal statute).

115. If drug manufacturers such as AbbVie are required to provide their drugs to contract pharmacies, the magnitude of the economic loss is likely beyond the capacity of Illinois to compensate with damages. Discounted purchases under the Program reached approximately $66.3 billion for fiscal year 2023 in the United States. *See* Health Res. & Servs. Admin., *2023 340B Covered Entity Purchases* (Oct. 2024), https://tinyurl.com/56nzphvm.

116. Any attempt to subsequently recover losses from Illinois would likely be barred by the doctrine of sovereign immunity under the Eleventh Amendment. That alone renders AbbVie's financial losses "irreparable injury" for purposes of seeking an injunction. *Cal. Pharmacists Ass'n*, 563 F.3d at 851-52.

117. The cost to AbbVie of complying with State laws like Illinois is substantial. For example, AbbVie estimates that the annual cost of complying with similar State laws in Mississippi and Missouri is around $33.1 million and $35 million, respectively. Complying with Illinois's law will cost AbbVie tens of millions of dollars per year (if not more). And as the number of States adopting these kinds of laws increases, so does the irreparable harm imposed.

118. As of filing, at least 21 other States have already passed contract pharmacy laws akin to Illinois's H.B. 2371—but with material differences among and between those State laws, complicating compliance and subjecting manufacturers to different and varying enforcement. *See generally* App'x.

119. Prospective injunctive relief is appropriate because of the ongoing nature of the infringement of constitutional rights resulting from H.B. 2371. That is, the law effects a repeated and ongoing mandatory private wealth transfer of AbbVie's 340B-discounted drugs to hospitals and to private, for-profit commercial pharmacies for private benefit and for no recognized public use, in violation of the U.S. Constitution. The law deprives AbbVie and other manufacturers of their federal rights under the actual terms of the 340B Program. And H.B. 2371 threatens to impose significant penalties upon manufacturers if they do not capitulate to Illinois's attempt to modify the terms of the federal 340B Program.

120. Prospective injunctive relief is appropriate even if the Court finds that Illinois's taking is for public use. AbbVie's rights are violated the moment of the taking. *Knick v. Township of Scott*, 588 U.S. 180, 190 (2019). State law does not provide AbbVie with just compensation or a remedy, and the Eleventh Amendment bars a suit for monetary relief brought under 42 U.S.C. § 1983. *See Quern v. Jordan*, 440 U.S. 332, 340 (1979); *Edelman v. Jordan*, 415 U.S. 651, 663 (1974).

121. Granting injunctive relief here would not harm Illinois. It is well settled that States have no interest in enforcing a regulation that violates federal law. *Pro. Towing & Recovery Operators of Ill. v. Box*, 2008 WL 5211192 (N.D. Ill. Dec. 11, 2008)*; Felder v. Casey*, 487 U.S. 131, 138 (1988) ("Under the Supremacy Clause of the Federal Constitution, the relative importance to the State of its own law is not material when there is a conflict with a valid federal

law, for any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." (citation modified)). Moreover, there is no evidence that uninsured and needy patients—in Illinois or anywhere else—benefit from the use of unlimited contract pharmacies. Illinois has no legitimate interest in enriching commercial pharmacies at the expense of manufacturers and patients.

122. Granting injunctive relief would also be in the public interest. The contract pharmacy system that H.B. 2371 protects provides no ascertainable benefits to patients or the greater public. Greater 340B revenues do not lead to increased uncompensated care, charity care, or improved patient care and outcomes. Contract pharmacy arrangements do not increase patient access to medications or reduce the prices patients pay. The only beneficiaries of this system are hospitals, commercial pharmacy chains, and their third-party administrators.

123. As the United States and other courts have explained, laws like H.B. 2371 risk upending the federal healthcare apparatus. As a result of laws like H.B. 2371, a major drug manufacturer withdrew from the 340B Program (and by extension Medicare and Medicaid) because of laws like Illinois's. DOJ AbbVie Amicus Curiae Brief at 17. "As a result, … dozens of drugs … previously supplied to Medicaid patients—including important medications used to treat gastrointestinal and neurological diseases—are no longer available through Medicaid." *Id.* That is because complying with different state 340B regimes will introduce additional burdens not contemplated by Congress in designing the federal healthcare apparatus. *See Wrigley*, 2026 WL 1133457, at *10 ("State laws like North Dakota's inhibit the ability of the government to exercise its spending power by deterring manufacturers from participating in the program.").

124. Moreover, the public has a strong interest in unconstitutional laws being enjoined. *Preston v. Thompson,* 589 F.2d 300, 303 n.3 (7th Cir. 1978) ("The existence of a continuing

constitutional violation constitutes proof of an irreparable harm, and its remedy certainly would serve the public interest.").

## FIRST CLAIM FOR RELIEF

### *Declaratory/Injunctive Relief – Federal Preemption Under the Supremacy Clause, U.S. Const. art. VI, cl. 2*

125.    AbbVie re-alleges and incorporates by reference all of the allegations contained in the preceding paragraphs of this complaint as though set forth fully herein.

126.    Under the Supremacy Clause of the Constitution, federal law is "the supreme Law of the Land …, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. As a result, federal statutes enacted by Congress can preempt State law. *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000).

127.    Preemption can take multiple forms: express preemption, field preemption, and conflict preemption. *See FMC Corp. v. Holliday*, 498 U.S. 52, 56-57 (1990); *Petr Tr. for BWGS, LLC v. BMO Harris Bank N.A.*, 95 F.4th 1090, 1102 (7th Cir. 2024). These different forms preemption, however, are not rigidly distinct. *Crosby*, 530 U.S. at 372 n.6.

128.    Conflict preemption occurs where it is impossible for a private party to comply with both State and federal law or where "the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby*, 530 U.S. at 372-73 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)) (alterations adopted). Illinois's H.B. 2371 conflicts with or otherwise obstructs Congress's 340B Program in multiple ways.

129.    H.B. 2371 conflicts with federal law by targeting the federal 340B Program and its participants and seeking to change the terms of that program. It is foundational constitutional law that States may not regulate Congress's creations. *See McCulloch v. Maryland*, 17 U.S. 316, 359 (1819); *see also United States v. Washington*, 596 U.S. 832, 838 (2022) (explaining that States

may not "interfer[e] with or control[] the operations of the Federal Government"). Yet that is all that H.B. 2371 does. It dictates the terms upon which manufacturers must sell drugs at confiscatory prices and to whom manufacturers must sell them. Illinois's law applies only to those manufacturers that participate in the federal 340B Program, however, and thus has no purpose or effect aside from regulating 340B conduct. But AbbVie cannot be subjected to discriminatory regulations because it contracted with the federal government. And Illinois may not require terms for 340B participation in addition to or different from those that the United States has pronounced sufficient in the 340B statute and the PPAs.

130. H.B. 2371 is especially problematic in this sense because the 340B Program entails a contractual relationship (PPAs) between the United States and manufacturers. *See Barnes v. Gorman*, 536 U.S. 181, 186 (2002) ("Spending Clause legislation [is] much in the nature of a contract …." (emphasis omitted)). The terms of that contract—AbbVie's access to Medicaid and Medicare Part B in exchange for congressionally identified hospitals receiving discounted drugs— are laid out in the 340B statute. 42 U.S.C. § 256b. Therefore, even if federal law is silent about the extent of manufacturers' obligations to contract pharmacies, as many States contend, that just means that Congress decided ***not*** to include restrictions like the ones found in H.B. 2371 as a part of the bargain. Congressional silence is not an invitation for Illinois to tack on new terms to the United States' contract with AbbVie or single out those with federal contract relationships or that participate in federal programs for special State-law disabilities. *See Washington*, 596 U.S. at 838-41 (providing that the Supremacy Clause prohibits States from "discriminat[ing] against … those with whom [the federal government] deals" by "'singl[ing] them out' for less favorable 'treatment'" or by "regulat[ing] them unfavorably on some basis related to their governmental 'status'"); *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504-13 (1988); *Lawrence County v. Lead-*

*Deadwood Sch. Dist. No. 40-1*, 469 U.S. 256, 269-70 (1985) (holding that adding conditions to a Spending Clause program "substantial[ly] interfere[d]" with discretion Congress granted to the local governments, which obstructed participation in the program).

131. The government that created and administers the 340B Program agrees. *See* DOJ AbbVie Amicus Curiae Brief, *supra*, at 11-16; DOJ PhRMA Amicus Curiae Brief, *supra*, at 10-15. Specifically, in recent amicus curiae briefs before the United States Courts of Appeals for the First and Tenth Circuits, the United States argued that Rhode Island's and Colorado's H.B. 2371 analogues violate the Supremacy Clause by "impermissibly target[ing] and discriminat[ing] against manufacturers that participate in [the 340B Program]" through the "impos[ition of] additional burdens." DOJ AbbVie Amicus Curiae Brief, *supra*, at 12-13; DOJ PhRMA Amicus Curiae Brief, *supra*, at 12.

132. H.B. 2371 also undeniably imposes new State-law obligations that have the purpose and effect of expanding the 340B Program. Illinois compels manufacturers to make more confiscatory-priced sales than the 340B Program contemplates. And H.B. 2371 broadens the class of entities entitled to receive 340B-discounted prices and forces manufacturers to transfer their discounted drugs to third parties—specifically, commercial pharmacies—who are not covered entities. Illinois law thus directly conflicts with the federal 340B statute, which leaves manufacturers free to impose reasonable conditions on their 340B offers and authorizes discounts only to covered entities. *See Drummond*, 808 F. Supp. 3d at 1276-77 (holding that a comparable statute was preempted because it "effectively expands the definition of 'covered entity' to include contract pharmacies, … 'contrary to federal law'"); *Brown*, 809 F. Supp. 3d at 1359-60 (finding AbbVie stated a plausible preemption claim against an analogous State law because the law "meaningfully expands the scope of entities entitled to 340B discounts"). Indeed, Congress

specifically defined which entities qualify for 340B discounts and intentionally chose not to mandate manufacturer participation in contract pharmacy arrangements. *See AstraZeneca*, 543 F. Supp. 3d at 60. As the United States has recognized, laws like H.B. 2371 "are significant enough to alter any manufacturer's cost-benefit analysis" of whether to continue participating in the 340B Program. DOJ AbbVie Amicus Curiae Brief, *supra*, at 17. "Only the federal government can determine the extent to which it will tolerate the risk of manufacturer withdrawal." *Id.* "Congress properly determines what conditions should attach to 340B Program participation, and [Illinois] is not free to supplement that scheme." *Id.* at 18.

133. H.B. 2371 thus obstructs the 340B Program at least because its increased burdens discourage participation in the program. *Lawrence County*, 469 U.S. at 269-70 (1985) (holding that adding conditions to a Spending Clause program "substantial[ly] interfere[d]" with discretion Congress granted to the local governments, which obstructed participation in the program); *Forest Park II v. Hadley*, 336 F.3d 724, 733-34 (8th Cir. 2003) (state attempt to remove "incentive" given to federal program participants was preempted).

134. H.B. 2371 creates other conflicts, too. For example, Illinois's law bars a manufacturer from demanding "data or information" from covered entities. H.B. 2371, § 15(c)(3). But the federal 340B Program contemplates that manufacturers can request such data, and ensuring compliance with the program essentially requires it.

135. The federal 340B statute forbids the "transfer" of 340B-discounted drugs to anyone but a covered entity's patients. 42 U.S.C. § 256b(a)(5)(B). If a manufacturer suspects that such diversion is occurring between a covered entity and its contract pharmacy, or that a covered entity is claiming duplicate discounts, the only way to enforce such violations is through the federal ADR process (not State or other federal law, or even through private suit). *See id.* § 256b(d)(3); *accord*

*Astra*, 563 U.S. at 121-22. However, to access the federal ADR process, the 340B statute requires that a manufacturer first "conduct an audit of a covered entity … as a prerequisite to initiating [ADR] proceedings against a covered entity." 42 U.S.C. § 256b(d)(3)(B)(iv). And before a manufacturer can conduct an audit, it must have "reasonable cause" to suspect a violation of the 340B statute—which requires access to claims data. *See* 61 Fed. Reg. 65,406, 65,407 (Dec. 12, 1996) (providing that "audits are to be performed only when there is a reasonable cause to believe that there has been a violation" of the 340B statute). The federal enforcement scheme therefore operates through a sequence of required steps: a manufacturer must first identify indicia of diversion or duplicate discounts, then conduct an audit, and only then may it invoke the federal ADR process.

136. H.B. 2371 interferes with that sequence by imposing an absolute ban on manufacturers requiring certain information from covered entities, including a ban on "requir[ing] or compel[ling] a 340B covered entity or 340B contract pharmacy to … submit data or information … to receive 340B drugs." H.B. 2371, § 15(c).

137. Claims data is a critical component of AbbVie's ability to avail itself of the exclusive federal 340B remedies. HRSA "require[s] manufacturers to submit an audit work plan … to establish reasonable cause." 61 Fed. Reg. at 65,406. And HRSA also provides that audits should be performed only "where there are valid business concerns." *Id.* Manufacturers must review claims-level utilization information to determine whether an apparent anomaly reflects legitimate utilization or a potential violation of the 340B Program, thus establishing "reasonable cause" and the commencing of an audit and potentially an ADR proceeding. Claims-level data from covered entities includes prescription identifiers, prescriber information, pharmacy/dispensing identifiers, patient eligibility data, or other claim-level fields necessary to

48

determine whether a drug was dispensed to an eligible patient or whether duplicate discounts occurred. Without such claims-level data, manufacturers only have access to routine data for 340B sales, which is limited to order quantities, shipments, invoices, and chargeback information tied to National Drug Codes, date, and delivery location. This routine information may not (and often does not) provide the necessary indicia of noncompliance that AbbVie would need to establish "reasonable cause."

138. Indeed, manufacturers use claims data—as opposed to routine 340B sales data—to identify abuse within the program and to identify audit targets. For example, AbbVie is aware of a covered entity that has several child sites and locations around New York City, and those various sites have overlapping contract pharmacy arrangements. Once analyzed, claims data revealed that those covered entities submitted multiple replenishment orders for the same patient dispensing event—essentially seeking double, triple, or quadruple replenishment. Without conditioning access to claims data on AbbVie's 340B offers, AbbVie would have no practical ability to identify this kind of overbilling and to pursue audits or ADR remedies for this sort of misconduct by covered entities.

139. H.B. 2371's claims data prohibition further conflicts with federal law by denying manufacturers the only feasible method for avoiding paying duplicate discounts under the 340B Program and DPNP. Without claims data, manufacturers are unable to quickly and accurately identify which dispenses were both 340B- and MFP-eligible and avoid unnecessary duplicate discounts.

140. Covered entities (and contract pharmacies) do not voluntarily provide claims-level utilization data to manufacturers, so AbbVie must condition its offers upon access to it. And HRSA has long assumed that manufacturers would be able to obtain claims data from covered

49

entities by contract. 59 Fed. Reg. 25,110, 25,114 (May 13, 1994); Defendants' Reply in Further Support of their Cross Motion for Summary Judgment at 8, *Novartis Pharms. Corp. v. Becerra*, No. 25-0117 (D.D.C. Apr. 18, 2025) (HRSA: "Plaintiffs can collect data that they need on the 340B status of prescriptions through other means. As Intervenor 340B Health notes, many manufacturers already 'require 340B Hospitals to collect and report data to a vendor employed by the relevant manufacturer.'").

141. Therefore, by preventing manufacturers like AbbVie from requiring claims data or otherwise seeking clarity from covered entities, Illinois effectively forecloses manufacturers' only avenue to pursue audits or claims against covered entities for violations of the 340B Program's requirements. On this basis, two district courts found that analogous claims data provisions in West Virginia and Oklahoma directly conflicted with federal law and were preempted. *See Morrisey*, 760 F. Supp. 3d at 451-53; *Drummond*, 808 F. Supp. 3d at 1277-78. It is further unlawful because it prevents manufacturers from deduplicating price concessions between the 340B Program and the DPNP. No federal court of appeals has held a claims-data prohibition like H.B. 2371's constitutional.

142. Illinois's law also conflicts with the federal 340B Program by installing a parallel enforcement regime. The Attorney General "is authorized to enforce this Act under its general authority under the Attorney General Act." H.B. 2371, § 40. But "Congress vested authority to oversee compliance with the 340B Program in HHS and assigned no auxiliary enforcement role to covered entities" or States. *See Astra*, 563 U.S. at 117. Pursuant to that authority, HHS specifically created ADR review for claims related to 340B "overcharge[s]." 42 C.F.R. § 10.21(a)(1). Notably, both HHS and covered entities agree that this ADR review encompasses claims that a manufacturer limited covered entities' acquisition of 340B drugs, including by limiting the use of

50

contract pharmacies. *See, e.g.*, 89 Fed. Reg. at 28,644; Am. Hosp. Ass'n, Comment on 340B Drug Pricing Program; Administrative Dispute Resolution ("ADR Rule"), HRSA-2022-0001-0030 (HRSA Jan. 27, 2023), at 2, https://tinyurl.com/4znmhz86. Illinois's H.B. 2371—by creating a new forum for enforcing the 340B Program and giving private parties the ability to sue manufacturers—is thus an even more brazen attempt to end-run Congress's choice not to include private or State enforcement of 340B than was at issue in *Astra*. 563 U.S. at 118 ("The absence of a private right to enforce the statutory ceiling-price obligations would be rendered meaningless if 340B entities could overcome that obstacle by suing to enforce the [HHS-manufacturer] contract's ceiling-price obligations instead.").

143. Congress not only defined who was entitled to administer the 340B Program (the Secretary of HHS, who has lawfully delegated the authority to HRSA), but it also delineated which tools were available to the Secretary to ensure compliance. The 340B statute defines which audit procedures and ADR mechanisms are available under the 340B Program for handling disputes among manufacturers and covered entities concerning 340B Program compliance. *See* 42 U.S.C. § 256b(d)(1)-(3). The 340B statute also spelled out the types of claims it expected to be resolved through ADR—"claims by covered entities that they have been overcharged for" 340B drugs. *Id.* § 256b(d)(3)(A). HRSA accordingly designed ADR to resolve "[c]laims by a covered entity that it has been overcharged by a manufacturer for a covered outpatient drug, including claims that a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price." 42 U.S.C. § 10.21(a)(1). These are the very disputes that Illinois enforcement regime covers. *See* H.B. 2371, § 15(a). Likewise, Congress outlined the penalties that apply to manufacturers who violate the statutory requirements under the 340B Program and engage in "overcharging." *See* 42 U.S.C. § 256b(d)(1)-(3). Illinois's attempt to

install an alternative compliance and enforcement regime is preempted. *See, e.g.*, *Drummond*, 808 F. Supp. 3d at 1277 ("Oklahoma stands functionally in the same place that the county did in *Astra*, enforcing the 340B Program itself, in contravention of what Congress contemplated when it centralized enforcement in the government." (citation modified)); *Wis. Dep't of Indus., Lab. & Hum. Rels. v. Gould Inc.*, 475 U.S. 282, 291 (1986) (finding a State law pursuing a federal goal preempted because "it assumes for the State of Wisconsin a role Congress reserved exclusively for the Board").

144. Another type of implied preemption is field preemption, which occurs where "Congress has legislated comprehensively to occupy an entire field of regulation, leaving no room for the States to supplement federal law." *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016) (quoting *Nw. Cent. Pipeline Corp. v. State Corp. Commc'n of Kan.*, 489 U.S. 493, 509 (1989)). Field preemption occurs where Congress intends "to foreclose any state regulation in the area, even if it is parallel to federal standards." *Arizona v. United States*, 567 U.S. 387, 401 (2012).

145. Every element of the federal 340B Program—from eligibility and pricing to compliance and enforcement—is governed by federal law. Federal law controls not just the dollar amount of the 340B price but also the circumstances under which manufacturers are required to make that discounted price available to covered entities. Because the availability of the 340B price "is exclusively controlled by the federal statute, … state enforcement of it would necessarily intrude on the federal scheme." *Morrisey*, 760 F. Supp. 3d at 458 (internal citation omitted); *Drummond*, 808 F. Supp. 3d at 1275-77 (finding Oklahoma's contract pharmacy law preempted because it regulates "the *price* at which [] drugs must be sold"). H.B. 2371 directly intrudes on the federal 340B scheme. Illinois's law bars manufacturers from "deny[ing], restrict[ing], prohibit[ing], condition[ing], or otherwise interfer[ing] with, either directly or indirectly, the

52

acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B covered entity or a 340B contract pharmacy authorized to receive 340B drugs on behalf of the 340B covered entity unless the receipt is prohibited by federal law." H.B. 2371, § 15(a). And the term "340B drug" is defined by reference to the 340B ceiling price established by federal law. *Id.* § 10. Thus, the Illinois law prohibits manufacturers from conditioning their 340B offers by declining to transfer their drugs to contract pharmacies *at a particular price*. *See Morrisey*, 760 F. Supp. 3d at 455-56; *Drummond*, 808 F. Supp. 3d at 1275-77.

146. Manufacturers violate laws like H.B. 2371 "not by withholding drugs from contract pharmacies, but by refusing the 340B discount when delivering [their] drugs to those pharmacies." *Morrisey*, 760 F. Supp. 3d at 455-56; *see also Drummond*, 808 F. Supp. 3d at 1275-77 (same). That H.B. 2371 defines the drugs at issue as "340B drug[s]" confirms that the statute is a price regulation: "*Price* is what distinguishes between an 'ordinary drug' and a 340B Program drug— a fact that seems to be reflected in the [Illinois] statute itself." *Morrisey*, 760 F. Supp. 3d at 455-56 (emphasis added); *see also Drummond*, 808 F. Supp. 3d at 1276 ("[W]hen H.B. 2048 defines a '340B drug' as a 'drug that has been subject to any offer for reduced prices by a manufacturer pursuant to [42 U.S.C. § 256b] and is purchased by a covered entity as defined in [42 U.S.C. § 256b(a)(4)]' it does so in recognition of the fact that the only difference between a '340B drug' and a non-340B drug is ... [its] price." (second and third alterations in original) (footnote omitted)). Accordingly, by *expressly* regulating the availability of the 340B price, defining "340B drug" to mean "a drug that has been subject to an offer for *reduced prices* by a manufacturer pursuant to [the 340B Program] and is purchased by a 340B covered entity," and tethering the definition of "340B covered entity" to the federal 340B *drug pricing* program, H.B. 2371 clearly intrudes on the federal 340B Program. H.B. 2371, § 10.

147.    H.B. 2371 was enacted in response to manufacturers' policies, which (according to covered entities) result in overcharges. But the federal statute does not authorize State regulation concerning 340B pricing and who is entitled to access manufacturers' drugs at discounted 340B prices. It leaves no room for States to interfere with the carefully designed, federally created 340B Program. *See Arizona*, 567 U.S. at 401 (holding that where Congress has occupied the field, State laws that impose additional obligations are preempted).

148.    The federal 340B statute carefully prescribes who may access 340B discounts, when, and under what conditions—including compliance with federal anti-diversion and duplicate discount requirements. The federal statute governs how prices and discounts are calculated and what obligations manufacturers must follow, requiring them to offer 340B pricing ***only*** to covered entities—not third parties. *See* 42 U.S.C. § 256b(a)(1). There can be no question that the 340B Program is a federal creation through and through.

149.    The growing patchwork of divergent State laws exacerbates the constitutional and compliance problems. The difficulty of complying with varying State regulatory frameworks only increases as more States pass new and different laws relating to the 340B Program. As of filing, at least 21 other States have passed contract pharmacy laws akin to H.B. 2371. State laws such as those passed by Arkansas, Colorado, Hawaii, Louisiana, Maine, Maryland, Minnesota, Mississippi, Missouri, Nebraska, New Mexico, North Dakota, Oklahoma, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, Washington, and West Virginia have material differences among and between themselves, complicating compliance by manufacturers and subjecting manufacturers to different and varying enforcement. *See, e.g.*, W. Va. Code § 60A-8-6a (extending prohibitions to an "agent, or affiliate" of a manufacturer); La. Rev. Stat. § 40:2884(B) (prohibiting a manufacturer from "interfer[ing] with a pharmacy contracted with a

340B entity"); N.M. H.B. 78, § 1(A)(4), 57th Leg., 1st Sess. (2025) (covering only entities "receiv[ing] federal grant funding"); Neb. L.B. 168, § 3(1), 109th Leg., 1st Sess. (2025) (compelling delivery to "*any location*" authorized by a covered entity (emphasis added)). Some States, like Tennessee, prohibit requiring the submission of claims data while others do not. *Compare* Md. Health Occupations Code § 12-6C-09.1(c)(1) (prohibiting restrictions on "delivery" or "acquisition" of "340B drugs"), *with* Tenn. S.B. 1414, § 47-18-136(a)(1), 114th Gen. Assembly (2025) (restricting the collection of "any health information, claims or utilization data, purchasing data, payment data, or other data"). Some States, like Utah, impose criminal penalties for failure to comply while others do not. *Compare* Mo. Rev. Stat. §§ 407.095, 407.100, 407.110 (allowing for civil penalties), *with* Utah Code Ann. § 31A-2-308(9) (making violations of the statute a Class B misdemeanor).

150. As these laws continue to accrete, administration of the 340B Program and compliance with a patchwork of State laws may become untenable, with potential catastrophic effects for the nationwide prescription drug industry and for Medicaid and Medicare beneficiaries. Adam J. Fein, *EXCLUSIVE: The 340B Program Soared to $38 Billion in 2020—Up 27% vs. 2019*, Drug Channels (June 16, 2021), https://tinyurl.com/4jdjhh7u (analyzing HRSA data to find the 340B Program accounted for "16% of … total U.S. gross sales of brand-name drugs at list prices" in 2020); *Drummond*, 808 F. Supp. 3d at 1277 n.65 (referencing a drug manufacturer's decision to withdraw from federal health programs because of the 340B Program's rising costs).

151. Importantly, the injury here flows *not* from the federal 340B Program itself, but from Illinois's attempt to override and distort it. H.B. 2371 imposes new obligations that conflict with the structure Congress created. Here, AbbVie does not challenge Congress's design or dispute the requirements imposed under federal law. Rather, it challenges Illinois's effort to

rewrite those requirements by transforming a conditional federal offer into a mandatory, State-enforced sale on terms the federal statute does not require (and which may in fact even *violate* the federal statute), and by effectively foreclosing AbbVie's ability to access the federal enforcement scheme. After all, AbbVie's contract-pharmacy policy complies with the 340B Program's requirements. Illinois's law does not fill a gap: It tears through the fabric of the federal scheme Congress designed to be uniform, voluntary, and within the exclusive federal enforcement authority of HHS.

**SECOND CLAIM FOR RELIEF**

***Prospective Injunctive Relief and Declaratory Relief –***
***Violation of Takings Clause, U.S. Const. amend. V, cl. 4***

152.    AbbVie re-alleges and incorporates by reference all of the allegations contained in the preceding paragraphs of this complaint as though set forth fully herein.

153.    The Takings Clause of the Fifth Amendment provides: "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend. V; *see also Chi. Burlington & Quincy Ry. v. Chicago*, 166 U.S. 226, 234-35 (1897) (incorporating and making applicable to States the Takings Clause of the Fifth Amendment through the Due Process Clause of the Fourteenth Amendment).

154.    The Takings Clause extends to both real and personal property. *Horne*, 576 U.S. at 358. It is not limited to instances when the government physically appropriates property for its own use through eminent domain. A taking can also occur through legislation and regulation that sufficiently deprives a user of its property rights, *see E. Enters. v. Apfel*, 524 U.S. 498, 529 (1998), or when the State gives a transfers property rights between third parties, *see Cedar Point Nursery v. Hassid*, 594 U.S. 139, 148 (2021).

155.     Under the Constitution, the government has no authority to force A-to-B transfers of private property for the benefit of private parties.  *See Kelo*, 545 U.S. at 477 (explaining that "the sovereign may not take the property of *A* for the sole purpose of transferring it to another private party *B*, even though *A* is paid just compensation").  Such private takings are always unconstitutional, since "[n]o amount of compensation can authorize such action."  *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 543 (2005); *see also Calder v. Bull*, 3 U.S. (3 Dall.) 386, 388 (1798) ("It is against all reason and justice" to allow government to "take[] property from A. and give[] it to B.").

156.     "Whenever a regulation results in a physical appropriation of property, a *per se* taking has occurred."  *Cedar Point*, 594 U.S. at 149.  Statutes or regulations that mandate the physical transfer of personal property from one private party to another private party amount to an unconstitutional taking with or without just compensation.

157.     Illinois's H.B. 2371 appropriates AbbVie's property rights in its drugs for the private benefit of hospitals and their for-profit, commercial pharmacy partners.  On its face, H.B. 2371 prohibits manufacturers from "deny[ing], restrict[ing], prohibit[ing], condition[ing], or otherwise interfer[ing] with, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B covered entity or a 340B contract pharmacy authorized to receive 340B drugs on behalf of the 340B covered entity unless the receipt is prohibited by federal law."  H.B. 2371, § 15(a).  Illinois thus requires manufacturers to provide their drugs to covered entities, commercial pharmacies, and other covered-entity-authorized entities at below-market prices by adding a State-law obligation onto the federal 340B scheme.  That is an impermissible *per se* taking under the Constitution's Takings Clause.  *See Drummond*, 808 F. Supp. 3d at 1279-

80 (finding that Oklahoma's contract pharmacy law "effects an [*per se*] unconstitutional taking" "for purposes of bestowing a private benefit"); *Brown*, 809 F. Supp. 3d at 1360-62 (same).

158.    H.B. 2371 mandates that pharmaceutical manufacturers provide drugs at below-market prices, depriving them of control over their own pricing structures and revenue.  It compels sales or transfers of AbbVie's drugs at the 340B-discounted price that, in the absence of H.B. 2371, would not occur.  AbbVie's offer is conditioned on the covered entity's acceptance of AbbVie's contract-pharmacy policy.  Without H.B. 2371, if a covered entity counteroffered with a term requiring unlimited contract pharmacy access, AbbVie would simply refuse and no sale at the 340B-discounted price would take place.  *Anand v. Marple*, 522 N.E.2d 281, 283 (Ill. 1988) ("It is elementary that for a contract to exist there must be an offer and acceptance, and the acceptance must comply strictly with the terms of the offer.  A conditional acceptance or one which introduces new terms that vary from those offered constitutes a rejection of the original offer and becomes a counterproposal which must be accepted by the original offeror before a valid contract is formed.").  However, H.B. 2371 compels AbbVie to accept the counteroffer and complete the sale at the discounted price on terms AbbVie would not otherwise have agreed to.  Because H.B. 2371 applies to AbbVie's offer conditions, it necessarily applies at the offer stage—*i.e.*, pre-sale.

159.    H.B. 2371 expands the federal 340B Program requirements in a way that shifts financial burdens onto manufacturers, reducing revenue without just compensation and with no justified public use.  *See Drummond*, 808 F. Supp. 3d at 1280 (finding an analogous law a *per se* taking because it does not "serve[] a *Kelo*-kosher public purpose" and the "confiscatory" prices it mandates do no constitute just compensation).  Even if there were a public use here, AbbVie will never receive just compensation.  State law provides none, and the Eleventh Amendment prevents AbbVie from seeking monetary relief from Illinois in a 42 U.S.C. § 1983 suit.

160. AbbVie does not voluntarily participate in H.B. 2371's compulsion of additional discounts not required by the federal 340B Program. *Brown*, 809 F. Supp. 3d at 1362 ("The court is not persuaded that AbbVie's voluntary participation in the 340B Program precludes such a claim. AbbVie voluntarily participates in the 340B Program in exchange for a federal benefit— its drugs are covered under the Medicaid and Medicare program. However, AbbVie does not voluntarily accede to the wider parameters of S.B. 69 in exchange for some benefit.").

161. In the alternative, H.B. 2371 effectuates a regulatory taking.

162. In *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 124 (1978), the Supreme Court recognized that a regulatory taking requires consideration of a flexible three-factor test: (1) the economic impact of the regulation, (2) the extent to which the regulation has interfered with investment backed expectations, and (3) the "character of the governmental action."

163. H.B. 2371's requirement that manufacturers transfer their drugs to commercial pharmacies effectuates a constitutionally impermissible regulatory taking because it requires the physical acquisition of AbbVie's drugs by another private party for no public purpose or use and imposes significant financial losses on AbbVie and other manufacturers. H.B. 2371 interferes with drug manufacturers' reasonable investment-backed expectations because manufacturers did not agree to comply with State 340B laws as part of its agreement to participate in the 340B Program and, for most of the Program's history, conditions like those included in AbbVie's contract pharmacy policy were standard practice. And the character of H.B. 2371—a regulation that serves no valid government purpose and deprives manufacturers of the full use and control of their property on a continual basis for the commercial benefit of private parties—renders Illinois's law self-evidently unconstitutional.

**PRAYER FOR RELIEF**

**WHEREFORE**, AbbVie prays for the following relief:

1. A declaration, order, and judgment holding H.B. 2371 unlawful because it is preempted by federal law and unconstitutional under the Supremacy Clause;

2. A declaration, order, and judgment declaring that H.B. 2371 effects an unconstitutional taking of AbbVie's property;

3. A declaration, order, and judgment holding that the federal 340B statute does not require drug manufacturers to unconditionally provide 340B pricing to covered entities or contract pharmacies, or to transfer or cause their discounted covered outpatient drugs to be transferred to contract pharmacies;

4. A declaration, order, and judgment holding that the federal 340B statute empowers drug manufacturers to require covered entities to provide claims data in exchange for 340B pricing;

5. A preliminary and permanent injunction enjoining Defendant from enforcing H.B. 2371 against AbbVie;

6. An award of all costs and attorneys' fees pursuant to any applicable statute or authority; and

7. Any other relief that this Court deems just and proper.

Dated: August 7, 2026

Respectfully submitted,

*/s/ Matthew S. Owen*
Matthew S. Owen (N.D. Ill. #1013970)
Hank Minor (*pro hac vice* forthcoming)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street N.W.
Washington, DC 20036
Telephone: (202) 955-8616
Email: mowen@gibsondunn.com
      hminor@gibsondunn.com

Meredith M. Pohl (*pro hac vice* forthcoming)
KING & SPALDING LLP
1700 Pennsylvania Avenue, N.W.
Suite 900
Washington, DC 20006
Telephone: (202) 737-0500
Email: mpohl@kslaw.com

K. Ross Powell (N.D. Ill. #89495)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue N.W.
Washington, DC 20004
Telephone: (202) 389-5000
Email: ross.powell@kirkland.com

*Counsel for Plaintiffs*

# Appendix

| | AR | CO | HI | IL | LA | MD | ME | MN | MO | MS | ND | NE | NM | OK | OR | RI | SD | TN | UT | VT | WA | WV |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Restricts collection of claims data** | – | ✓ | – | ✓ | – | – | ✓ | – | – | – | ✓ | ✓ | ✓ | – | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| **Defines "340B entity" to include pharmacies** | – | – | – | – | ✓ | – | ✓ | – | – | ✓ | ✓ | – | – | ✓ | – | – | – | ✓ | ✓ | – | – | – |
| **Applies only to certain 340B covered entities** | – | – | – | – | – | – | – | – | – | – | – | – | ✓ | – | – | – | – | – | – | – | – | – |
| **Prohibits conditioning 340B offers on receipt of contracts** | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | ✓ | – | – | – |
| **Requires "acquisition" by a pharmacy or entity** | – | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | – | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| **Requires delivery to any location** | – | ✓ | – | – | – | – | – | – | – | – | – | ✓ | – | – | – | – | ✓ | ✓ | ✓ | – | ✓ | ✓ |
| **Prohibits "interfering" with "eligible patients" or pharmacies** | – | – | – | ✓ | ✓ | – | ✓ | – | – | ✓ | ✓ | – | ✓ | ✓ | – | ✓ | – | – | – | ✓ | – | – |
| **Prohibits use of rebates** | – | – | – | – | – | – | – | – | – | – | ✓ | – | – | – | – | – | – | – | – | – | – | – |

| | AR | CO | HI | IL | LA | MD | ME | MN | MO | MS | ND | NE | NM | OK | OR | RI | SD | TN | UT | VT | WA | WV |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Restricts right to impose time limits on replenishment orders** | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | ✓ | – | – | – |
| **Applies to an "agent" or "affiliate"** | – | ✓ | ✓ | – | – | – | ✓ | – | ✓ | – | – | ✓ | ✓ | – | – | ✓ | – | ✓ | ✓ | ✓ | ✓ | ✓ |
| **Imposes criminal sanctions** | – | – | ✓ | – | – | ✓ | – | – | – | ✓ | ✓ | – | ✓ | ✓ | – | – | – | ✓ | ✓ | – | – | – |
| **Creates a private right of action** | – | ✓ | ✓ | – | – | – | ✓ | – | – | – | – | – | – | – | – | ✓ | ✓ | ✓ | – | ✓ | ✓ | – |